Deborah A. Sivas (CA Bar No. 135446)
Matthew J. Sanders (CA Bar No. 222757)
Stephanie L. Safdi (CA Bar No. 510417)
Amanda Zerbe (CA Bar No. 352565)
Jerry Zhu (CA Bar Student Cert. No. 998928)
Stephen Ferruolo (CA Bar Student Cert. No. 997055)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone:  (650) 725.8571
Facsimile:  (650) 723.4426

*Attorneys for JOHN MUIR PROJECT of EARTH
ISLAND INSTITUTE,
PLUMAS FOREST PROJECT, and
FEATHER RIVER ACTION!*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**(Sacramento Division)**

| | |
|---|---|
| JOHN MUIR PROJECT of EARTH ISLAND INSTITUTE; PLUMAS FOREST PROJECT; and FEATHER RIVER ACTION!, | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| v. | |
| UNITED STATES FOREST SERVICE; and CHRISTOPHER CARLTON, Forest Supervisor of Plumas National Forest, | |
| Defendants. | |

Case No.

**INTRODUCTION**

1.   The National Environmental Policy Act ("NEPA") requires agencies to prepare an environmental impact statement ("EIS") for any proposed federal action that may have a "reasonably foreseeable significant effect on the quality of the human environment."  42 U.S.C. § 4336(b)(1). This suit challenges the failure of the United States Forest Service ("Forest Service") to prepare an EIS before deciding to log and burn 217,721 acres of the Plumas National Forest, including "133,321 acres of high-quality mature forest habitat."  Final Environmental Assessment ("Final EA") at 3.2-3.

2.   Mature and old-growth forests have been heavily logged in the past, and the remaining mature forest habitat in the Sierra Nevada Mountains is crucial both to protect the biodiversity that remains and in the fight against climate change.  President Biden recognized the critical importance of preserving this remaining habitat in Executive Order 14072, signed on April 22, 2022.  That order states that expanses of mature and old-growth forests on federal lands are "critical to the health, prosperity, and resilience of our communities" because they "provide clean air and water, sustain the plant and animal life fundamental to combating the global climate and biodiversity crises, and hold special importance to Tribal Nations."  To protect these "irreplaceable" forest resources, Executive Order 14072 announced the Administration's policy "to pursue science-based, sustainable forest and land management" that will "conserve America's mature and old-growth forests on Federal lands."

3.   In a related follow-up announcement on December 19, 2023, the White House reaffirmed and expanded its commitment to protect mature and old-growth forests managed by the Forest Service, directing the agency to amend all forest management plans across the country "to conserve and restore old-growth forests" and outlining an interim policy that any projects proposing logging on National Forest lands where mature and old-growth conditions exist should undergo full environmental review under NEPA.

4.   Rather than adhere to these policies and employ a science-based management approach for the conservation and restoration of mature and old-growth forests, in May 2022 – less than a month after Executive Order 14072 was issued – the Forest Service rushed to announce a series of massive and unprecedented logging projects on the Plumas National Forest, much of it in mature and old-growth habitat.  Under the guise of community protection, these projects will allow private

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

companies to log hundreds of thousands of acres on National Forest lands, including vast areas of mature and old-growth forest far from the communities they claim to protect.

5. To justify the logging of large trees in mature habitat, the Forest Service developed a "Community Protection Concept" designed to cover nearly one-quarter of the Plumas National Forest. But rather than evaluate the cumulative impacts of this dramatic plan, the Forest Service segmented the environmental review into two projects: (1) the Community Protection – Eastside Project and ("Eastside Project"); and (2) the Community Protection – Central and West Slope Project ("Central/West Slope Project"). The Central/West Slope Project alone will affect more than one-fifth of the Plumas National Forest and cost more than $650,000,000, even though less environmentally destructive, less expensive, and more effective alternatives are available to reduce community wildfire risks.

6. The Forest Service failed to comply with NEPA before approving the Central/West Slope Project on September 10, 2023. Instead of preparing an EIS for what is one of the largest logging projects in Plumas National Forest history, the Forest Service prepared an environmental assessment ("EA") for the Central/West Slope Project. After release of the Draft EA, Plaintiffs submitted multiple comments, backed by many scientific studies, raising serious questions about the adverse impacts of the proposed logging on critical wildlife habitats and mature and old-growth forests. At the same time, Plaintiffs also cited numerous studies suggesting that the Forest Service's approach to the Central/West Slope Project would provide ineffective protection to local communities from wildfires and could increase threats to public safety from fires. The Forest Service failed to address these comments in any meaningful way in the Final EA.

7. Based on the Final EA, the Forest Service issued a Decision Notice and Finding of No Significant Impact under NEPA for partial implementation of the Central/West Slope Project on September 12, 2023. That Decision Notice covers 69,925 acres in the LaPorte/Greater Mohawk area, leaving nearly 148,000 more acres that are part of the Central/West Slope Project to be covered by one or more additional NEPA findings. In addition, the related and proximate Eastside Project will require its own separate NEPA finding(s).

8. The Forest Service's approval decision for a portion of the Central/West Slope Project

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1  without preparing an EIS, without conducting an adequate direct and cumulative impacts analysis,

2  and without meaningfully considering a reasonable range of alternatives to remote logging in mature

3  and old-growth forest areas was inconsistent with NEPA and unlawful.  Substantial scientific

4  evidence supports the conclusion that the proposed logging activities, especially the removal of larger

5  trees, will have adverse impacts on mature forest habitat, the species that occupy that habitat, and

6  potentially the storage of carbon in the larger trees in those forest areas.  The Forest Service's own

7  documents admit that habitat impacts will occur.  In fact, in order to authorize the logging of larger

8  diameter trees in mature and old-growth habitat, the Forest Service needed to override the governing

9  Plumas National Forest Land and Resource Management Plan ("Plumas Forest Plan") with an

10  emergency amendment that will allow much more logging than previously deemed acceptable to

11  protect forest habitat and species.

12      9.   The stated purpose and need for this emergency amendment and for the proposed logging

13  activity is community protection, yet the Forest Service failed to consider any alternative that would

14  limit logging to those areas most proximate to human communities and use other management

15  techniques, like prescribed burning, in more remote forest areas.  At the very least, there are

16  substantial questions about the efficacy of the Forest Service's proposal to protect communities.

17  Given the intensity of the proposed logging, especially in combination with other similar projects like

18  the Eastside Project, and recent science showing that remote commercial logging does not reduce

19  wildfire risk to communities, the Forest Service should have prepared an EIS that fully considered the

20  potentially significant direct, indirect, and cumulative impacts from the massive Central/West Slope

21  Project and evaluated reasonable alternatives to mitigate those impacts.  Its failure to do so violated

22  NEPA.

23                      **JURISDICTION AND VENUE**

24      10. The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and

25  28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act).

26      11.  Venue is proper in this District under 28 U.S.C. § 1391(e) because (a) the project at issue

27  in this action is located in this District and (b) the Forest Service office that prepared the NEPA

28  Environmental Assessment and issued the Decision Notice is located in this District.

12.  Because the events or omissions giving rise to the claims asserted in this complaint occurred on the Plumas National Forest in Counties of Plumas, Sierra, Butte, and Yuba, assignment of this case to the Sacramento Division of the Court is proper under Local Rule 120(d).

## **PARTIES**

13.  Plaintiff John Muir Project is a fiscally sponsored project of EARTH ISLAND INSTITUTE ("EII"), a nonprofit, public interest corporation, organized under the laws of the State of California, and established pursuant to section 501(c)(3) of the Internal Revenue Code. Headquartered in Berkeley, California, EII is a membership organization with over 15,000 members in the U.S., thousands of whom use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual, and other purposes.  EII's mission is to develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment.  Through education and activism, these projects promote the conservation, preservation, and restoration of the Earth.  One of these projects is the John Muir Project, whose mission is to protect all federal public forestlands from commercial exploitation that undermines and compromises science-based ecological management.  The John Muir Project has offices in San Bernardino County, California.  EII's John Muir Project and EII's members actively participate in governmental decisionmaking processes with respect to National Forest lands in California and rely on information provided through NEPA processes to increase the effectiveness of their participation.

14.  EII's members include individuals who regularly use and continue to use public lands within Plumas National Forest – including the exact tracts of lands in the Plumas National Forest areas proposed for logging – for scientific study, recreational enjoyment, aesthetic beauty, nature photography, and wildlife observation.  These members' interests will be irreparably harmed by the planned logging and vegetation management activities, as they will no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants, especially the old-growth and mature trees and the California spotted owl.

15.  Plaintiff PLUMAS FOREST PROJECT ("PFP") is a volunteer, environmental advocacy entity created in 1990.  PFP's main purpose is to use science, experience, and logic to monitor and

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

improve Plumas National Forest fuel reduction and timber sale projects.  PFP's primary tool to achieve its goals is to provide reasonable alternatives to the Forest Service's proposed actions.  It has successfully offered forest management techniques to the Forest Service, some of which have been adopted.  PFP's founding member is a fifty-one-year resident of Plumas County and an avid recreationalist of Plumas National Forest, including those exact tracts of lands in Plumas National Forest proposed for logging.  He frequently engages in recreational activities throughout the forest, including leading weekly public hikes.  In 2018, the deadliest wildfire in California's history, Camp Fire, wreaked havoc on PFP's founding member.  It burned down the homes of his family, destroying intimate memories, heirlooms, and history.

16. Plaintiff FEATHER RIVER ACTION! ("FRA") is a non-profit grassroots organization based in Portola, California.  FRA's mission is to monitor, publicize, and defend against threats to the Feather River ecosystem (which is in Plumas National Forest), including forest mismanagement.  FRA's most immediate goal is to protect Plumas National Forest and its old-growth and mature trees from further logging which threatens the ecosystem.  FRA has continuously and actively advocated for the protection of old-growth and mature forests in Plumas National Forest and for the curtailment of logging projects, extreme herbicide application and other activities that may threaten the forest.  To achieve these goals, FRA has organized public tours of Plumas National Forest, written op-eds and blog posts on protecting old-growth and mature forests and submitted public comments to logging projects.  FRA's members include individuals who regularly use and continue to use public lands within Plumas National Forest – including the exact tracts of lands in Plumas National Forest areas proposed for logging – for scientific study, aesthetic beauty, nature photography, wildlife observation, and recreational activities like skiing, camping, backpacking and others.  These members' interests will be irreparably harmed by the planned logging and vegetation management activities, as they will no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants, especially old-growth and mature trees and the California spotted owl.

17.  This suit is brought by EII, PFP, and FRA on behalf of themselves and their adversely

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

affected members and staff, as well as concerned members of the public.  Plaintiffs and their members' present and future interests in, and use of, the Plumas National Forest areas planned for logging and vegetation treatment actions are and will be directly and adversely affected by the agencies' impending actions.  Those adverse effects include, but are not limited to: (1) destruction of old-growth and mature forests from logging and vegetation treatment; (2) impacts on native plants and wildlife and their habitats – and especially to the California spotted owl and its habitat – within and around the Central/West Slope Project areas from logging and vegetation treatment; (3) reduction and impairment of recreational opportunities; (4) impairment of clean air, clean water, stable climate, aesthetic values of forest lands, trails, and landscapes caused by Defendants' logging and vegetation treatment; (5) loss of scientific study and viewing opportunities with regard to old–growth and mature trees and wildlife in areas proposed for logging and vegetation treatment; and (6) detriment to forest health, fire resiliency, and fire safety.  In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands.

18.  Defendants' failure to comply with the requirements of NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, when authorizing and implementing the various logging and other "vegetation treatment" actions at issue in this lawsuit has caused and is causing actual and imminent harm to Plaintiffs' interests, as described above, and to the old-growth and mature forests that they seek to protect.  Plaintiffs rely on the Forest Service to comply with the procedural and substantive requirements of these laws for the protection of Plumas National Forest. A favorable decision by the Court in this case will redress the actual and imminent injury to Plaintiffs and the harm to Plumas National Forest.  A court order directing Forest Service to comply with NEPA could result in a substantial change to the various activities to minimize or avert harm to Plaintiffs' members and Plumas National Forest from the logging, vegetation treatment activities, and destruction of old-growth and mature forests caused by Defendants' continuing actions.

19.  Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the United States Department of Agriculture charged with managing the public lands and resources of Plumas National Forest in accordance with NEPA and the National Forest Management Act and their

implementing regulations.  The Forest Service issued the final decision at issue in this case and, in doing so, failed to comply with applicable law.

20. Defendant CHRISTOPHER CARLTON, Forest Supervisor of Plumas National Forest, approved the Central/West Slope Project in Plumas National Forest and signed the Decision Notice and Finding of No Significant Impact at issue in this case.  The Decision Notice and Finding of No Significant Impact is the Forest Service's final agency action regarding the Central/West Slope Project.  Defendant Carlton is sued only in his official capacity.

## LEGAL BACKGROUND

### A.    National Environmental Policy Act

21.  Congress enacted NEPA as a national policy to "encourage productive and enjoyable harmony between man and his environment," to help "prevent or eliminate damage to the environment," and "to enrich the understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321.

22.  NEPA has two fundamental purposes: (1) to guarantee that, before taking an action, federal agencies take a "hard look" at the consequences of that action to ensure that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

23.  The White House Council on Environmental Quality ("CEQ"), the United States Department of Agriculture ("USDA"), and the Forest Service have promulgated regulations to implement NEPA.  40 C.F.R. § 1500 *et seq*.; 7 C.F.R § 1b.1 *et seq*.; 36 C.F.R. § 220.1 *et seq.*

24.  NEPA requires an agency to prepare an Environmental Impact Statement ("EIS") for any "major Federal action" that has a reasonably foreseeable significant effect on the quality of the human environment.  42 U.S.C. § 4336(b)(1).  A "major Federal action" is an "activity or decision subject to Federal control and responsibility," typically taking the form of an official policy adoption, a formal plan or program adoption, or the federal approval or undertaking of a proposed project.  40

1   C.F.R. § 1508.1(q).

2       25.   To determine whether an effect is "significant" under NEPA, an agency must consider

3   "the potentially affected environment" and the "degree" of the effects of the action.  40 C.F.R. §

4   1501.3(b).

5       26.   The "potentially affected environment" includes the "affected area (national, regional, or

6   local) and its resources."  40 C.F.R. § 1501.3(b)(1).  These resources include species listed under the

7   Endangered Species Act and critical habitats for those species.  *Id.*

8       27.   In evaluating "degree," an agency must consider short- and long-term effects, beneficial

9   and adverse effects, effects on public health and safety, and effects that would violate laws protecting

10  the environment.  40 C.F.R. § 1501.3(b)(2)(i-iv).  A project's size is relevant because larger projects

11  are more likely to have significant impacts.  *Greater Hells Canyon Council v. Wilkes*, No. 2:22-CV-

12  00859-HL, 2023 WL 6443823, at *10 (D. Or. Aug. 31, 2023).

13      28.   An agency must also consider "connected actions" in determining significance.  40

14  C.F.R. § 1501.3(b).  Connected actions are actions that are "closely related," including actions that (i)

15  [a]utomatically trigger other actions that may require" an EIS; (ii) "cannot or will not proceed unless

16  other actions are taken previously or simultaneously"; or (iii) "[a]re interdependent parts of a larger

17  action and depend on the larger action for their justification."  40 C.F.R § 1501.9(e)(1)(i)-(iii).

18      29.   An agency must provide a single EIS for proposals or parts of proposals that are closely

19  related enough to be a single project.  40 C.F.R. § 1502.4(a).  A "single NEPA review document is

20  required for distinct projects when there is a single proposal governing the projects or when the

21  projects are connected, cumulative, or similar actions under the regulations implementing NEPA."

22  *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1304 (9th Cir. 2003) (quoting *Native*

23  *Ecosystems Council v. Dombeck*, 304 F.3d 886, 893–94 (9th Cir. 2002)).

24      30.   An EIS is also required when substantial questions are raised about a project's

25  environmental impact.  *BARK v. U.S. Forest Serv.*, 958 F.3d 865, 869-70 (9th Cir. 2020); *Ocean*

26  *Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005).  An EIS is more often

27  necessary when a project is large in scope, has uncertain impacts, and affects local species.  *Wilkes*,

28  2023 WL 6443823, at *16.

31.  NEPA regulations allow officials to prepare an EA to help them determine whether a proposed action significantly affects the environment.  40 C.F.R. § 1501.5.  An EA must provide sufficient evidence and analysis to determine whether the agency needs to prepare an EIS.  *Id.*  If the agency concludes that a project may have significant impacts on the environment, it must prepare an EIS.  42 U.S.C. § 4336(b)(1).  If the EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impact."  40 C.F.R. § 1501.6.

32.  Even an EA, however, must consider the action's cumulative impact on the environment, which is the impact that results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions.  *See*, *e.g.*, *Native Ecosystems Council*, 304 F.3d at 895.  EAs are inappropriate, and an EIS is required, for any "proposals that would substantially alter the undeveloped character of an inventoried roadless area or a potential wilderness area."  36 C.F.R. § 220.5(a)(2).

33.  In July 2023, CEQ proposed to revise its current NEPA regulations, including by further elaborating on when an action is significant.  88 Fed. Reg. 49,924 (July 31, 2023).  The proposed regulations reflect case law that requires action agencies to examine both the context of the action and the intensity of its impacts in determining whether the effects of the proposed action are significant.  Intensity factors include effects that may be beneficial or adverse, the degree to which the proposed action may adversely affect unique characteristics of the geographic area, and the degree to which the potential effects on the human environment are highly uncertain.  A significant adverse effect may exist even if the agency considers that on balance the effects of the action will be beneficial.  Significance cannot be avoided by segmenting an action into small component parts.

34. When preparing either an EA or an EIS, an agency must take a "hard look" at all reasonably foreseeable direct, indirect, and cumulative environmental impacts of the proposed action. 40 C.F.R. § 1508.1(g).  In the Ninth Circuit, the "hard look" standard means that an agency's environmental analysis must be "more than perfunctory," *BARK*, 958 F.3d at 872, and must rely on "accurate scientific analysis."  *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005).

35.  The Forest Service's specific NEPA implementing regulations also provide requirements

for evaluating cumulative impacts. The agency must first consider the "direct and indirect effects on the environment that are expected or likely to result from the alternative proposals for agency action" and then evaluate the present effects of past actions that are "relevant and useful because they have a significant cause-and-effect relationship with the direct and indirect effects of the proposal for agency action and its alternatives." 36 C.F.R. § 220.4(f). Once the Forest Service has identified the present effects of past actions that warrant consideration, the agency must assess the extent to which the proposed action's effects will add to, modify, or mitigate those past effects. *Id.*

36. To find that an EIS is not required under the hard look standard, an agency must base its decision "on a consideration of the relevant factors, and provid[e] a convincing statement of reasons to explain why a project's impacts are insignificant." *BARK*, 958 F.3d at 869.

37. In either an EA or EIS, NEPA requires an agency to consider a reasonable range of alternatives to serve the stated purpose and need for the proposed project, such that the agency may make an informed choice about whether and how to proceed. 42 U.S.C. § 4332(C)(iii). An agency must "study, develop, and describe appropriate alternatives" regardless of whether it prepares an EA or an EIS. 42 U.S.C. § 4332(H). There must be a meaningful difference between the alternatives considered. The existence of a viable but unexamined alternative renders an EIS or EA inadequate.

38. Before deciding on a proposal, the Forest Service must complete the environmental document review, consider public comments on environmental documents and agency responses to those comments, and consider the alternatives analyzed in the environmental documents before deciding on the proposal. 36 C.F.R § 220.4(c).

**B.    Administrative Procedure Act ("APA")**

39. The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, provides for judicial review of agency action. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in the record." *Id.* § 706(2). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's

1  decision "is so implausible that it could not be ascribed to a difference in view or the product of

2  agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43

3  (1983).

4      40.  When reviewing agency action under the APA, a court must ensure that the agency

5  reviewed the relevant data and articulated a satisfactory explanation establishing a "rational

6  connection between the facts found and the choice made."  *Id.* at 59.  The agency's failure to do so

7  renders its decision arbitrary and capricious.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378

8  (1989).

9      41.  Under the APA, a reviewing court must also set aside agency action, findings, and

10  conclusions found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D).

11                   **FACTUAL BACKGROUND**

12  **A.**    **The Plumas National Forest**

13      42.  Situated in the Sierra Nevada, the Plumas National Forest spans 1,146,000 acres and

14  covers multiple California counties, including Plumas, Butte, Sierra, Lassen, and Yuba.  Known for

15  its streams and lakes, deep canyons, and mountain valleys, the Plumas National Forest is also home

16  to mature and old-growth trees, some of which are over 400 years old.[1]  These mature forest stands

17  are required habitat for "a large number of wildlife species, including several sensitive wildlife

18  species," and also provide clean air, clean water, and forest resilience.  Final EA 3.2-3; Executive

19  Order 14072.  Unfortunately, while they are crucial in the fight against climate change by acting as

20  carbon sinks and absorbing carbon, only a "small fraction of the world's mature and old-growth

21  forests remains."

22      43.  The Plumas National Forest is also home to numerous sensitive, threatened, and

23  endangered species.  One such species is the California spotted owl, which the Forest Service

24  currently manages as a sensitive species due to the species' declining population and dwindling

25  habitats.  Final EA at 3.2-6.  The California spotted owl relies on mature forests for its nesting and

26

27

28

---

[1] https://www.oldgrowthforest.net/ca-valley-creek.

Case No.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1    roosting habitat, which are threatened by both logging and climate change.[2]  In February 2023, the

2    U.S. Fish and Wildlife Service proposed a rule to list the Sierra Nevada population of California

3    spotted owls as threatened under the Endangered Species Act.  88 Fed. Reg. 11,600 (Feb. 23, 2023).

4        44.  Because the California spotted owl is highly imperiled, the governing 1988 Plumas Forest

5    Plan prohibits logging in California spotted owl "Protected Activity Centers."  These Protected

6    Activity Centers "are designated protected areas where there are known or suspected nests of

7    California spotted owl[s]."  Final EA at Appendix 30.  The purpose of these centers is "to protect and

8    maintain high quality nesting and roosting habitat in the vicinity of nests."  *Id.*

9        45.  The Central/West Slope Project will log or otherwise disturb 36,422 acres located within

10   Protected Activity Centers and an additional 43,402 acres in spotted owl Home Range Core Areas

11   that surround the Protected Activity Centers and, together comprise the essential core areas of spotted

12   owl territories.  Final EA at 2-12.  To circumvent the Forest Plan's restrictions and allow substantial

13   logging in mature forest habitat used by California spotted owls, the Forest Service amended the

14   Plumas Forest Plan as part of its decision approving the Central/West Slope Project.

15   **B.    The Community Protection Concept and Central/West Slope Project**

16       46.  Executive Order 14072 emphasizes the importance of forests in the country's fight

17   against climate change and stresses the small fraction of remaining mature and old-growth forests.

18   These forests serve as crucial carbon sinks in the goal of reaching net-zero greenhouse gas emissions

19   and are some of "the most biodiverse parts of our planet."

20       47.  Executive Order 14072 establishes the Biden Administration's policy of protecting

21   "mature and old-growth forests on Federal lands" and the Administration's commitment to doing its

22   part to combat forest degradation and deforestation around the world.

23       48.  On May 4, 2022, immediately following Executive Order 14072, the Forest Service

24   publicly proposed a "Community Protection Concept" ostensibly to reduce wildfire risk across the

25   Plumas National Forest, focused on four areas: (1) West Slope Communities, (2) Greater American

26

27   ───────────────
[2] https://www.fs.usda.gov/research/treesearch/54985#:~:text=Spotted%20owls%

28   20are%20habitat%20specialists,and%20large%20coarse%20woody%20debris.

Case No.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Valley, (3) Greater Mohawk Valley, and (4) Eastside Communities.[3]  The public notice included a map marking all four affected areas.  See Figure 1.  The Forest Service marketed the Community Protection Concept as single project to reduce the risk of wildfire impacts to communities and noted the claimed need to amend the 1988 Forest Plan.  The notice also stated that the Forest Service would undertake NEPA review for the Community Protection Concept.[4]  The Community Protection Concept has not been implemented, and a comprehensive NEPA review for the whole project has not been done.

**Figure 1:** Community Protection Concept Project Area



49.  Instead, in September 2022, the Forest Service divided the Community Protection Concept into two projects: (1) the Central/West Slope Project and (2) the Eastside Project.[5]  The Central/West Slope Project covers approximately 217,721 acres of federal land and includes the West

---

[3] https://www.fs.usda.gov/project/?project=62128#:~:text=We%20propose%20to%20reduce%20risk,through%20an%20all%2Dlands%20approach.
[4] https://www.fs.usda.gov/project/?project=62873 (*Protect Proposed Action Scoping Attachment* at 7).
[5] https://www.fs.usda.gov/sopa/components/reports/sopa-110511-2022-10.html.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Slope Communities, Greater American Valley, and the Greater Mohawk Valley.  The Eastside Project covers approximately 57,462 acres of federal land in the Eastside Communities.  Both the Central/West Slope Project and the Eastside Project were included in the original Community Protection Concept.  The Forest Service did not provide any reason for separating these related projects into two different NEPA analyses.

50.  Both the Central/West Slope Project and the Eastside Project would entail logging solely or largely in the Beckwourth Ranger District of the Plumas National Forest.  The projects are separated by less than 20 miles, a distance that is substantially less than the 50-mile distance within the boundaries of the Central/West Slope Project itself.

51.  Both the Central/West Slope Project and the Eastside Project propose to use mechanical logging and prescribed burns in similar landscapes to address the same purported purpose of reducing wildfire risk and severity, and community protection.  The Forest Service itself has stated that the effectiveness of the projects depends on implementing similar projects.  Despite these similarities and the interrelated nature of the proposed actions, Forest Service inexplicably prepared separate EAs for them.

52. The Central/West Slope Project and the Eastside Project are not the only logging projects that the Forest Service is proposing or recently has implemented in Plumas National Forest and adjacent forestlands.  Additional surrounding projects also claim to mitigate risks to critical infrastructure and communities through logging.

**C.    The NEPA Process and Analysis**

53.  In June 2023, the Forest Service released a Draft EA for the Central/West Slope Project and opened a 30-day comment period.  The stated purpose of this project is to mitigate wildfire risk to communities and critical infrastructure through "fuels reduction and other vegetation treatment" on 217,721 acres throughout the Plumas National Forest.

54.  The Forest Service proposed to use a variety of methods to remove vegetation, including primarily mechanical thinning, prescribed fire, and herbicides.  Mechanical thinning refers to "the felling and removal of trees using heavy machinery," which involves bulldozers, harvesters, excavators, and skidders.  Mechanical thinning for this project would involve mainly "whole-tree

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

skidding," a technique where "the entire tree would be cut and removed." Skidders, which are heavy vehicles used in the logging industry, will then drag the trees across the forest to a landing, where they will be "processed and cut to market length." To accommodate this heavy equipment, new roads would be constructed through the forest.

55. Of the nearly 218,000 acres included in the Central/West Slope Project, roughly 177,000 acres are slated for mechanical thinning with heavy equipment and roughly 35,000 acres would be subject to manual thinning. Final EA at Table 2-8. While prescribed burning would accompany both mechanical and manual thinning, only approximately 5,600 acres would be subject only to prescribed burning, despite the lower cost of this vegetation management approach. *Id.*

56. As part of the project, the Forest Service would apply seven different herbicides, including some herbicides banned in the European Union. These herbicides threaten plants that are food sources for wildlife in the forest. Nearly 50,000 acres within the Central/West Slope Project would be subject to herbicide application. Final EA at Table 2-8.

57. The extent of the forest "thinning" planned for the Central/West Slope Project does not resemble the mechanical thinning projects completed in the recent past or allowed by existing Forest Service rules. To protect important wildlife habitat, the Plumas Forest Plan, as amended in 2004 by the Sierra Nevada Forest Plan Amendment, specifies basal area and canopy cover requirements and imposes restrictions on the maximum size of trees that can be cut in mature forests outside the wildland urban interface. To accomplish the more intensive and extensive logging proposed in the Central/West Slope Project, the Forest Service had to amend the Plumas Forest Plan in a way that disregards these protective measures and allows more habitat-destructive logging. Despite this significant change in applicable conservation requirements, the Forest Service did not engage in a meaningful discussion of the applicable science or resulting impacts on wildlife species and their habitat.

58. Instead, the Forest Service attempted to support its more intensive approach by pointing to two General Technical Reports prepared in 2009 and 2012, both drafted by Forest Service researcher Malcolm North. Draft EA at 1-3; Final EA at 1-4. Since these reports were prepared, both more than a decade ago, there has been extensive real-world experience with wildfire on forests

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

stands in and near the Plumas National Forest, as described below.  The analysis in the EA does not address this real-world experience in any meaningful way.

59.  During the 30-day public review period on the Draft EA for the Central/West Slope Project, Plaintiffs submitted extensive comments concerning the failure of the Forest Service to take a hard look at impacts or analyze a reasonable range of alternatives, explaining that a full EIS should be prepared consistent with the requirements of NEPA.  In addition to comments regarding the agency's failure to comply with NEPA, Plaintiffs also provided a detailed scientific analysis supported by reference and citation to dozens of studies raising substantial questions about the assumptions on which the project analysis is based.

60.  For instance, Plaintiffs explained that the Forest Service's underlying approach to reducing community wildfire risk – based on the assumption that mechanical thinning of vast forest areas distant from communities will stop fires from reaching towns or sufficiently slow fires to allow suppression before they reach communities – proved to be a failure on similar nearby forest lands during the Camp Fire of 2018 (which reached and burned the town of Paradise), the Dixie Fire of 2021 (which reached and burned the town of Greenville), the Caldor Fire of 2021 (which reached and burned the town of Grizzly Flats), and the North Complex Fire of 2020 (which reached and burned the towns of Berry Creek and Feather Falls).  In support of these comments, Plaintiffs provided detailed maps showing how extensive logging on upwind private and public forest lands prior to each of these four wildfires did not protect human communities or achieve the risk reduction that the Forest Service claims will occur as a result of similar logging in the Central/West Slope Project.

61.  Plaintiffs further explained that the Ninth Circuit Court of Appeals recognized in *BARK*, 958 F.3d at 870, that the efficacy of "variable density thinning" – which is proposed for all areas within the Central/West Slope Project (see Final EA at 2-3) – in reducing wildfire risk is the subject of "considerable contrary science and expert opinion" and that such a dispute raises "substantial questions" requiring preparation of an EIS that fully engages this issue.

62.  Plaintiffs also cited numerous studies (1) demonstrating that logged dry forests of the kind in the Central/West Slope Project area did not reduce wildfire severity and may actually increase it; (2) suggesting that mechanical thinning in mature and old-growth forests kills more trees than it

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Case No.

saves from wildfire; and (3) showing that mechanical thinning of dry forests emits more carbon dioxide to the atmosphere than even the most intensive wildfires.

63.  In response to the map information concerning recent wildfires and the numerous supporting studies provided by Plaintiffs, the Forest Service summarily dismissed Plaintiffs' evidence in the Final EA, which was essentially unchanged from the Draft EA, rather than engaging in a meaningful analysis of the science in an EIS, as the Ninth Circuit Court of Appeals required in *BARK*.

64.  In their comments, Plaintiffs also highlighted alternative ways to achieve the stated purpose of the Central/West Slope Project of reducing wildfire risks for human communities.  First, Plaintiffs proposed the alternative of defensible space pruning on National Forest lands adjacent to private properties combined with prescribed fire, without thinning on the rest of the Central/West Slope Project area.  Plaintiffs provided evidence that the only effective way to protect homes from fire is home-hardening and defensible space pruning within 200 feet of homes.  Plaintiffs also cited scientific evidence that tree removal is not necessary prior to using prescribed fire as a community safety buffer from extreme fires.  Second, Plaintiffs requested that the Forest Service consider using hand thinning and under-burning as a reasonable alternative for achieving the purpose of the project.

65.  Plaintiffs emphasized that, compared to the narrow alternatives proposed by the Forest Service, these reasonable alternatives were cheaper, less environmentally destructive, and better addressed the stated purpose and need for the Project.

66.  The Final EA did not meaningfully address these comments or explain why such alternatives were unreasonable or infeasible for consideration.  Furthermore, the Forest Service analysis did not include any information on how much of the treatment area would be near structures.

67.  Plaintiffs also submitted comments on the adverse impacts of logging on California spotted owls, alerting the Forest Service that the U.S. Fish and Wildlife Service recently proposed to list the California spotted owl in the Sierra Nevada as "threatened" under the Endangered Species Act.  Plaintiffs referenced studies, including studies conducted by Forest Service personnel, showing that fuel-reduction logging in California spotted owl habitat is associated with higher fire severity in many cases.  The declining status of the California spotted owl is a particular concern for the

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Central/West Slope Project, which will log a combined total of nearly 80,000 acres of California spotted owl Protected Activity Centers and Home Range Core Areas. Final EA at 2-12. Given these facts, the Forest Service had a heightened legal duty to fully evaluate project impacts on this candidate species.

68.  Instead of adequately evaluating the project's impacts on the California spotted owl, the Forest Service responded dismissively to public comments and concerns. It did not meaningfully engage the science showing that logging in this habitat can be detrimental to the species. Instead, it stated, without support, that because the project's proposed variable density thinning would protect the largest trees in clumps, it promotes a heterogenous forest structure that is "not expected to further degrade the level of existing viability" of the species. Final EA, Response to Comments at 6. Indeed, the Forest Service amended the Plumas Forest Plan as part of its Central/West Slope Project decision to allow *more* logging in California spotted owl protected habitat than currently permitted.

69.  The Final EA identifies 12 other reasonably foreseeable logging projects on the Plumas and adjacent Tahoe National Forests, including the 58,000-acre Eastside Project and the 146,000-acre North Yuba Project. These projects add more than 230,000 additional acres of forested area that will be subject to similar "fuels treatment," including logging, in proximity to the Central/West Slope Project. Final EA at Table 3-1. The Final EA states that the effectiveness of the Central/West Slope Project to fulfill its stated objective of community protection from wildfire depends on implementing these adjacent logging projects. Final EA at 3.1-1–24. Yet, the Final EA does not address the combined cumulative effects of the Central/West Slope Project together with other related logging and vegetation management projects in the vicinity, in violation of NEPA.

70.  In addition, by segmenting the environmental review for the Community Protection Concept into the closely related and interdependent fuel reduction activities included in the Central/West Slope Project and the Eastside Project, the Forest Service engaged in unlawful project piecemealing in violation of NEPA.

71.  The Central/West Slope Project encroaches on approximately 464 acres of inventoried roadless areas and 4,566 acres of designated wilderness, including affecting approximately 20 percent of the Bucks Lake Wilderness, an activity that requires the Forest Service to amend the Plumas Forest

1  Plan.

2      72.  Despite the dramatic nature of the proposed Central/West Slope Project, the Forest

3  Service offered no public meetings to the communities that live near the project, even after Plaintiffs

4  requested such meetings.  The agency invoked an emergency authorization on the grounds that the

5  project will "mitigate the harm to life, property, or important natural or cultural resources," 16 U.S.C.

6  § 6592c(a), thereby denying the public the normal participation procedures.

7      73.  On September 10, 2023, Plumas National Forest Supervisor Christopher Carlton signed

8  and approved the Decision Notice for the Central/West Slope Project, which incorporated a Finding

9  of No Significant Impact under NEPA.  The Decision Notice, which partially implements the

10  Central/West Slope Project, is the "first in a staged decision-making approach" and approved the

11  logging and burning of 69,925 acres of the LaPorte Greater Mohawk Area, including 54,026 acres of

12  mechanical thinning, 13,801 acres of manual thinning, and 69,925 acres of prescribed burns.

13      74.  On July 14, 2023, nearly two months before execution of the Decision Notice, the Forest

14  Service solicited bids for the Central/West Slope Project.

15      75.  On September 11, 2023, one day after the Decision Notice was signed, the Forest Service

16  opened the bidding process to log the forest.

17      76.  On December 18, 2023, the Forest Service awarded the contract for approximately $86

18  million, to Sierra Tahoe Environmental Management, LLC, a California company formed in August

19  2023, the month before the Decision Notice was issued, apparently in response to the bid solicitation.

20      77.  Implementation of the LaPorte/Greater Mohawk area portion of the Project is expected to

21  go forward "immediately."

22                          **CLAIM FOR RELIEF**

23                          **(Violations of NEPA)**

24      78.  Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth

25  above.

26      79.  In approving the Central/West Slope Project, the Forest Service violated, and are

27  continuing to violate, NEPA by:

28          a.  Failing to prepare an EIS despite substantial scientific questions and expert dispute

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

over the efficacy of mechanical thinning to achieve the project's stated purpose of wildfire risk reduction for communities and infrastructure;

b. Failing to take the requisite "hard look" and prepare an EIS despite the project's potentially significant direct and cumulative impacts on mature and old-growth forests, the California spotted owl and other wildlife species, carbon storage, emissions from the affected forestlands, and community safety;

c. Failing to consider and adequately evaluate the cumulative impacts of the Central/West Slope Project in conjunction with other nearby logging/thinning projects in adjacent forest habitat of the same type, including but not limited to the connected and interrelated Eastside Project and the nearby North Yuba Landscape Resilience Project;

d. Impermissibly segmenting environmental review for the Community Protection Concept into two separate NEPA analyses, thereby unlawfully piecemealing the evaluation of project impacts and avoiding the disclosure of collectively significant impacts and the Forest Service's obligation to prepare an EIS;

e. Failing to consider and evaluate a reasonable range of alternatives to the proposed Central/West Slope Project, including an alternative that includes no or significantly less mechanical thinning and an alternative that allows thinning directly in the defensible space area at the wildland urban interface; and

f. Failing to adequately evaluate effects on "the undeveloped character of an inventoried roadless area or a potential wilderness area" in which proposed thinning will occur, as required by 36 C.F.R. section 220.5(a).

80.  For the foregoing reasons, the Forest Service's actions are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law and are subject to judicial review under the APA, 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Declare that Defendant's Environmental Assessment and Finding of No Significant

Case No.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Impact violate NEPA, CEQ's NEPA regulations, USDA's NEPA regulations, and Forest Service's NEPA regulations;

(2) Declare that Defendant violated NEPA by failing to prepare an Environmental Impact Statement;

(3) Order Defendant to vacate and set aside the Environmental Assessment, Finding of No Significant Impact, Decision Notice, any permits and contracts to third parties that involve the Central/West Slope Project, and any other approvals or entitlements conditioned upon or arising out of those documents;

(4) Enjoin Defendant from approving or allowing any third party to enter and perform any mechanical or manual thinning within the Central/West Slope Project's treatment area, unless and until the Defendant complies with NEPA consistent with the Court's decision;

(5) Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements associated with this action; and

(6) Grant Plaintiffs such additional relief as the Court may deem just and proper.

DATED:  March 22, 2024

ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School


By:    */s/ Stephen Ferruolo*
Stephen Ferruolo, Certified Law Student
Jerry Zhu, Certified Law Student
Deborah A. Sivas, Supervising Attorney

*Attorneys for Plaintiffs* JOHN MUIR PROJECT OF EARTH ISLAND INSTITUTE, PLUMAS FOREST PROJECT, and FEATHER RIVER ACTION!

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF