Deborah A. Sivas (CA Bar No. 135446)
Matthew J. Sanders (CA Bar No. 222757)
Amanda D. Zerbe (CA Bar No. 352565)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone:  (650) 725.8571
Facsimile:   (650) 723.4426

*Attorneys for JOHN MUIR PROJECT,*
*PLUMAS FOREST PROJECT, and*
*FEATHER RIVER ACTION!*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

## (Sacramento Division)

| | |
|---|---|
| JOHN MUIR PROJECT of EARTH ISLAND INSTITUTE; PLUMAS FOREST PROJECT; and FEATHER RIVER ACTION!, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, <br><br> Defendant, <br><br> and <br><br> AMERICAN FOREST RESOURCE COUNCIL, <br><br> Defendant-Intervenor. | Case No. 2:24-CV-00909-TLN-JDP <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.  The Plumas National Forest, which sits high in the Sierra Nevada Mountain Range, supports some of the last remaining old-growth and mature forest stands in California.  These stands, some of which are over 400 years old, are as ecologically important as they are visually stunning.  They provide habitat for imperiled species like the California spotted owl, play a critical role in sequestering carbon, and contain the kind of cooler, moister microclimate that reduces wildfire risk.

2.  Periodic wildfire is an essential part of the natural ecological regime in Sierra forests.  These forests evolved with and are maintained by regular mixed-intensity fire events, which help thin the underbrush and enhance survival of mature trees.  This natural fire regime has been disrupted over the last several decades by the ill-advised fire suppression activities of the U.S. Forest Service, which have caused a "fire deficit" across Sierra forests.  In the last several decades, that fire deficit has contributed to "megafires" that grow and spread at unprecedented scale and speed.  During the same period, human populations have continued to expand into the wildland urban interface, putting people increasingly in harm's way during wildfire events.

3.  To address this situation, the Forest Service has proposed a series of "community protection" projects that include logging in mature and old-growth forest stands across more than half of the Plumas National Forest, including in areas that are far removed from human communities.

4.  In pursuing these projects, the Forest Service has ignored or improperly discounted the relevant science and reached instead for "solutions" that maximize the amount of timber removed from the forest rather than meaningfully reduce wildfire risks to human communities.  Removal of larger, mature trees from these forests will, in fact, have the opposite effect, exacerbating the hot, dry, windy conditions that give rise to the type of fast-moving wildfires that jump more quickly to populated areas.  The Forest Service improperly ignored or discounted substantial science demonstrating the likelihood of this outcome, apparently to maximize the amount of timber removed from the forest.

5.  This lawsuit challenges one of these proposed logging projects: the Community Protection–Central and West Slope Project ("Central/West Slope Project" or "Project").  This Project enables intensive logging and related operations on more than 217,000 acres – nearly one-fifth of the

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plumas National Forest.  According to Forest Service staff, it is likely the largest such project ever to be carried out in the entire history of the Plumas National Forest since it was established in 1905.

6. The Forest Service has prepared a number of environmental documents for the Central/West Slope Project, which the Forest Service estimates would cost American taxpayers $673 million (2025 EA at 3.8-3, Table 3.8-2).  None addresses the Project's flawed focus on removing remote, mature trees rather than more effective – and vastly less expensive (2025 EA at 3.8-3, Table 3.8-1) – approaches to public safety, such as conducting prescribed fire and creating defensible space near homes and communities to meaningfully reduce wildfire risk to human beings.

7. In June 2023, the Forest Service issued a draft Environmental Assessment ("2023 Draft EA") that set the Project's focus on mechanical thinning – intensive logging – and excluded from consideration an alternative that focused primarily on prescribed fire and defensible space on public lands near homes.  The Forest Service issued what it purported to be a final Environmental Assessment later that year ("2023 EA").  As it did so, the Forest Service invoked "emergency authority" to concurrently publish a Decision Notice ("Decision 1") that implemented the most logging-intensive alternative from the 2023 EA across nearly 70,000 acres of the Plumas forest.  The Forest Service's invocation of emergency authority also allowed it to skip over the typical objection period, during which the public could have raised concerns about its selection of this alternative.

8. A year later, and out of the blue, the Forest Service published in October 2024 a revised Environmental Assessment ("2024 EA") that conceded two sets of mathematical errors in its 2023 EA, but nevertheless did not withdraw Decision 1.  The 2024 EA introduced a new alternative that would allow even more intensive logging, including in habitat important to the imperiled California spotted owl.  The Forest Service concurrently published a draft second Decision Notice ("Draft Decision 2") that selected that more logging-intensive alternative.

9. In June 2025, following revisions in accordance with the objection process, the Forest Service released a new final Environmental Assessment ("2025 EA") and final Decision 2 ("Decision 2").  That final decision permitted 122,980 acres to be mechanically logged.  The Project would so intensively target larger, fire-resistant trees within mature forests in mostly remote areas that it would log 110 California spotted owl territories (2025 EA, Table 3.2-5) and reduce suitable California

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

spotted owl habitat in the Project area by 38 percent – or 51,281 acres (2025 EA at 3.2-25, Table 3.2-7b).  It would do so even as the U.S. Fish and Wildlife Service recently acknowledged that mechanical thinning is a threat to California spotted owls and recommended listing this species as Threatened under the Endangered Species Act in the Sierra Nevada.

10.  Throughout these iterations, the Project's true goal – to maximize timber extraction, not protect human communities – has been evident on its face.  As the 2025 EA admits, only 38 percent of all logging and related activities would occur inside the "Defense Zone" (2025 EA at 2-3 to 2-4, Table 2-1b) – the areas of the forest that directly adjoin human habitation and evacuation routes – even though the Project's purported purpose is to "mitigate risk to communities and critical infrastructure from wildfire."  2025 EA at 1-3.

11.  A robust body of science, including many studies by the Forest Service's own scientists, indicates that the Project will not protect communities.  This science demonstrates that mechanically thinning forests to decrease forest density, and particularly cutting mature trees, is ineffective at best and may even increase the threat of wildfire to communities.

12.  Because it affects the time that communities have to evacuate, current research indicates that rate of fire spread is the most important factor in determining how many lives and homes are lost during forest fires.  But the Forest Service itself has admitted that reductions in tree density and canopy cover from mechanical thinning can increase the rate at which fire spreads through the forest, by reducing the windbreak effect that denser forest stands have and allowing faster windspeeds to drive flames more rapidly.

13.  In addition, studies have repeatedly shown that effective approaches to protect communities from wildfires focus on measures that can be taken within a few hundred feet of communities – not on cutting remote forest stands.

14.  The Project is also likely to cause significant adverse impacts to mature forest ecosystems and species like the imperiled California spotted owl and others that depend on such habitat.

15.  Despite the Project's scale and the intensity of the logging it entails, its enormous stakes in terms of public safety and well-being, and the virtual certainty that the Project will cause significant adverse impacts to mature forest ecosystems, the Forest Service insisted on preparing one

-3-                                    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

environmental assessment after another, rather than the full Environmental Impact Statement ("EIS") required by the National Environmental Policy Act ("NEPA"). This legal violation warrants reversal and remand.

16. The Forest Service committed several other errors under NEPA. First, the Forest Service failed to meaningfully consider and evaluate cumulative ecological impacts. The Project is just one of several proposed logging projects in the Plumas National Forest and the directly adjacent Tahoe National Forest to the south. In addition to the Central/West Slope Project, the Forest Service has proposed thirteen other logging projects in the Plumas National Forest, many also under the guise of "community protection." On adjacent lands in the neighboring Tahoe National Forest, the Forest Service has proposed the North Yuba Landscape Resilience Project, again with the same purported purpose. Collectively, these projects propose widespread logging across roughly 800,000 acres of National Forest System lands within a single region of Northern California. The Forest Service failed to conduct the cumulative impacts analysis that NEPA requires for these reasonably foreseeable projects, especially given their similar purposes and geographic proximity, and cumulative impacts to the imperiled and declining California spotted owl, which inhabits these project areas.

17. Second, although the stated purpose of the Central/West Slope Project is to mitigate wildfire risk to human communities, the Forest Service failed to adequately consider a reasonable range of alternatives to achieve that purpose, including alternatives focused on prescribed fire and creating defensible space near communities. These approaches would be at least as or more effective in reducing risk to communities, come at a far lower cost, and have fewer significant adverse environmental effects than the logging-intensive alternatives the Forest Service ultimately selected.

18. Third, concerned members of the public submitted extensive comments at each step of the decisionmaking process for the Central/West Slope Project. Supporting these comments were many scientific studies that raise serious questions about the adverse impacts of mature and old-growth forest logging on critical wildlife habitat and the efficacy of such logging in protecting communities from wildfire. The Forest Service failed to meaningfully address these comments and the substantial body of science supporting them, as required by NEPA. Relatedly, the Forest Service failed to meaningfully disclose, in textual descriptions or mapping, what management activities

-4-    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

would happen where.

19. Fourth, the Forest Service failed to provide public notice and an opportunity to comment on the 2024 EA. That notice and comment opportunity was required because the 2024 EA evaluated, and the Forest Service selected, an entirely new alternative to implement the regional directive described in paragraphs 20 to 25 below.

20. The Forest Service's violations do not stop with NEPA. The agency also quietly altered the 1988 Plumas National Forest Land and Resource Management Plan, as amended by the 2004 Sierra Nevada Forest Plan Amendment Record of Decision ("Plumas Forest Plan"), on a project-by-project basis rather than pursuing a more generalized plan amendment for the Plumas National Forest as a whole. When it did so, the Forest Service violated the National Forest Management Act ("NFMA").

21. NFMA requires the Forest Service to develop and revise a land and resource management plan, more commonly known as a "forest plan," for each unit of the National Forest System. 16 U.S.C. § 1604. After their adoption, forest plans govern extraction projects and other activities on the National Forest unit. The current Plumas Forest Plan, as adopted prior to the Central/West Slope Project, prohibits the logging and other interventions proposed in the Project. To avoid those restrictions, the Forest Service purported to enact – as part of the operative NEPA alternative for Decision 2 – a series of "project-specific amendments" to the Plumas Forest Plan.

22. Those amendments change how areas otherwise protected as California spotted owl habitat are defined in order to allow mechanical logging in a greater area, and more intensive logging in a given area, than the Plumas Forest Plan previously permitted. In addition, outside of California spotted owl habitat areas, the amendments alter the Plumas Forest Plan to allow logging of live mature and old-growth trees up to 40 inches in diameter at breast height (over 10 feet in circumference) in the Project area when various ground conditions are met. The original Plumas Forest Plan prohibited any logging of trees greater than 30 inches in diameter at breast height, except as needed for equipment operability.

23. These amendments are project-specific in name only: The Forest Service has proposed, through a regional directive, the same amendments to the forest plans of five neighboring National

-5-                           Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Forests to allow for the same kinds of intensive logging.

24. NFMA requires such broadly applicable plan amendments to be pursued through a general forest plan amendments process rather than through project-specific procedures. In particular, general forest plan amendments require a more robust public process and review of associated environmental impacts than project-specific ones.

25. Here, the Forest Service bypassed that more robust process by labeling the Central/West Slope Project amendments to the Plumas Forest Plan "project-specific," when in fact they were not. As a result, the Forest Service was able to avoid public scrutiny of the amendments' key change – paring back the protections, including from logging, of mature trees under the existing the Plumas Forest Plan. Eliminating those protections may be consequential for species and ecosystems in the Plumas National Forest; eliminating them across six National Forests through "project-specific" changes may be catastrophic. NFMA requires full and public consideration of such sweeping changes and their collective impact. The Forest Service violated NFMA in failing to provide such public consideration when approving the Central/West Slope Project.

## JURISDICTION AND VENUE

26. The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act).

27. Venue is proper in this District under 28 U.S.C. § 1391(e) because (1) the Project at issue in this action is located in this District and (2) the Forest Service office that prepared the EAs and issued the Decision Notices is located in this District.

28. Because the events or omissions giving rise to the claims asserted in this complaint occurred on the Plumas National Forest in Counties of Plumas, Sierra, Butte, and Yuba, assignment of this case to the Sacramento Division of the Court is proper under Local Rule 120(d).

## PARTIES

29. Plaintiff John Muir Project is a fiscally sponsored project of EARTH ISLAND INSTITUTE ("EII"), a nonprofit, public interest corporation, organized under the laws of the State of California, and established pursuant to section 501(c)(3) of the Internal Revenue Code. Headquartered in Berkeley, California, EII is a membership organization with over 15,000 members

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

in the U.S., thousands of whom use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual, and other purposes. EII's mission is to develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment. Through education and activism, these projects promote the conservation, preservation, and restoration of the Earth. One of these projects is the John Muir Project, whose mission is to protect all federal public forestlands from commercial exploitation that undermines and compromises science-based ecological management. The John Muir Project is based in Tulare County, California, in the southern Sierra Nevada. EII's John Muir Project and EII's members actively participate in governmental decisionmaking processes with respect to National Forest lands in California and rely on information provided through NEPA processes to increase the effectiveness of their participation.

30. EII's members include individuals who regularly use and continue to use public lands within Plumas National Forest – including the exact tracts of lands in the Plumas National Forest areas proposed for logging – for scientific study, recreational enjoyment, aesthetic beauty, nature photography, and wildlife observation. These members' interests will be irreparably harmed by the planned logging and vegetation management activities, as they will no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants, especially the old-growth and mature trees and the California spotted owl.

31. Plaintiff PLUMAS FOREST PROJECT ("PFP") is a volunteer, environmental advocacy entity created in 1990. PFP's main purpose is to use science, experience, and logic to monitor and improve Plumas National Forest fuel reduction and timber sale projects. PFP's primary tool to achieve its goals is to provide reasonable alternatives to the Forest Service's proposed actions. It has successfully offered forest management techniques to the Forest Service, some of which have been adopted. PFP's founding member is a fifty-one-year resident of Plumas County and an avid recreationalist of Plumas National Forest, including those exact tracts of lands in Plumas National Forest proposed for logging. He frequently engages in recreational activities throughout the forest, including leading weekly public hikes. In 2018, the deadliest wildfire in California's history, the Camp Fire, wreaked havoc on PFP's founding member. It burned down the homes of his family,

-7-                    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

destroying intimate memories, heirlooms, and history.

32. Plaintiff FEATHER RIVER ACTION! ("FRA") is a non-profit grassroots organization based in Portola, California. FRA's mission is to monitor, publicize, and defend against threats to the Feather River ecosystem (which is in Plumas National Forest), including forest mismanagement. FRA's most immediate goal is to protect Plumas National Forest and its old-growth and mature trees from further logging which threatens the ecosystem. FRA has continuously and actively advocated for the protection of old-growth and mature forests in Plumas National Forest and for the curtailment of logging projects, extreme herbicide application, and other activities that may threaten the ecological integrity of the forest. To achieve these goals, FRA has organized public tours of Plumas National Forest, written op-eds and blog posts on protecting old-growth and mature forests, and submitted public comments to logging projects. FRA's members include individuals who regularly use and continue to use public lands within Plumas National Forest – including the exact tracts of lands in Plumas National Forest areas proposed for logging – for scientific study, aesthetic beauty, nature photography, wildlife observation, and recreational activities like skiing, camping, backpacking and others. These members' interests will be irreparably harmed by the planned logging and vegetation management activities, as they will no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants, especially old-growth and mature trees and the California spotted owl.

33. This suit is brought by EII, PFP, and FRA on behalf of themselves and their adversely affected members and staff, as well as concerned members of the public. Plaintiffs and their members' present and future interests in, and use of, the Plumas National Forest areas planned for logging and vegetation treatment actions are and will be directly and adversely affected by the agencies' impending actions. Those adverse effects include, but are not limited to: (1) destruction of old-growth and mature forests from logging and vegetation treatment; (2) impacts on native plants and wildlife and their habitats – and especially to the California spotted owl and its habitat – within and around the Central/West Slope Project areas from logging and vegetation treatment; (3) reduction and impairment of recreational opportunities; (4) impairment of clean air, clean water, stable climate,

-8-                                    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

aesthetic values of forest lands, trails, and landscapes caused by Defendants' logging and vegetation treatment; (5) loss of scientific study and viewing opportunities with regard to old-growth and mature trees and wildlife in areas proposed for logging and vegetation treatment; and (6) detriment to forest health, fire resiliency, and fire safety.  In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands.

34.  Defendants' failure to comply with the requirements of NEPA, NFMA, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, when authorizing and implementing the various logging and other "vegetation treatment" actions at issue in this lawsuit has caused and is causing actual and imminent harm to Plaintiffs' interests, as described above, and to the old-growth and mature forests that they seek to protect.  Plaintiffs rely on the Forest Service to comply with the procedural and substantive requirements of these laws for the protection of Plumas National Forest. A favorable decision by the Court in this case will redress the actual and imminent injury to Plaintiffs and the harm to Plumas National Forest.  A court order directing Forest Service to comply with NEPA and NFMA could result in a substantial change to the various activities to minimize or avert harm to Plaintiffs' members and Plumas National Forest from the logging, vegetation treatment activities, and destruction of old-growth and mature forests caused by Defendants' continuing actions.

35.  Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the United States Department of Agriculture ("USDA") charged with managing the public lands and resources of Plumas National Forest in accordance with NEPA, NFMA, and their implementing regulations.  The Forest Service issued the final decision at issue in this case and, in doing so, failed to comply with applicable law.

36.  Defendant-Intervenor AMERICAN FOREST RESOURCE COUNCIL ("AFRC") is a regional trade association representing forest product businesses and forest landowners.  This Court granted AFRC's motion to intervene permissively on November 8, 2024.

//

//

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## LEGAL BACKGROUND

### A. National Environmental Policy Act ("NEPA")

37. Congress enacted NEPA as a national policy to "encourage productive and enjoyable harmony between man and his environment," to help "prevent or eliminate damage to the environment," and "to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

38. NEPA has two fundamental purposes: (1) to guarantee that, before taking an action, federal agencies take a "hard look" at the consequences of that action to ensure that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989). An agency also violates NEPA's hard look requirement if its environmental analysis is overly vague and fails to meaningfully disclose specifically what would occur in the various units of a Project area, particularly in spatially larger projects. *North Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 829 (9th Cir. 2025); *Alliance for the Wild Rockies v. U.S. Forest Service*, No. 2:24-CV-157-RLP, 2025 WL 2655984 at *8 (E.D. Wash. 2025); *California ex rel. Lockyer v. U.S. Forest Service*, 465 F. Supp. 2d 917, 923-927 (N.D. Cal. 2006); *Center for Biological Diversity v. U.S. Forest Service*, No. CV 23-110-M-DWM, 2025 WL 3549515, at *4 (D. Mont. Dec. 11, 2025).

39. NEPA requires agencies to "make use of reliable data and resources" and to "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document." 42 U.S.C. § 4332.

40. In 2008, the Forest Service adopted regulations to implement NEPA. Those regulations incorporated and elaborated on the general regulations that the White House Council on Environmental Quality ("CEQ") adopted in 1978. 36 C.F.R. § 220.1 *et seq.* (1978); Forest Service Handbook 1909.15 Section 23. The Forest Service's 2008 regulations and CEQ's 1978 regulations continued to govern Forest Service actions taken before July 3, 2025, when the 2008 regulations were

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

repealed and replaced.  90 Fed. Reg. 29,674 (July 3, 2025); *Environmental Defense Center v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 863 n.2 (9th Cir. 2022).  Because the Forest Service issued its Decision Notices that approve the Central/West Slope Project on September 10, 2023, and July 1, 2025 – i.e., before July 3, 2025 – the Forest Service's 2008 NEPA regulations (and CEQ's 1978 regulations) apply in this case.

41.  NEPA requires an agency to prepare an EIS for any "major Federal action" that has a reasonably foreseeable significant effect on the quality of the human environment.  42 U.S.C. § 4336(b)(1).  A "major Federal action" is an action subject to Federal control and responsibility that may have a "significant" effect on the environment.  *Consol. Salmonid Cases*, 668 F. Supp. 2d 1013, 1018-20 (E.D. Cal. 2010) (citing 40 C.F.R. § 1508.18 (1978)).

42.  To determine whether an effect is "significant" under NEPA, an agency must consider the context of the proposed action and the intensity of its effects.  *In Defense of Animals, Dreamcatcher Wild Horse and Burro Sanctuary v. U.S. Dep't of the Interior*, 751 F.3d 1054 (9th Cir. 2014).  The context of a project – that is, its "setting and circumstances . . . including 'society as a whole (human, national), the affected region, the affected interests, and the locality'" – informs a court's evaluation of its intensity.  *Environmental Defense Center*, 36 F.4th at 865.  A project's size is relevant because larger projects are more likely to have significant effects.  *Greater Hells Canyon Council v. Wilkes*, No. 2:22-CV-00859-HL, 2023 WL 6443823, at *10 (D. Or. Aug. 31, 2023).

43.  An EIS is required when substantial questions are raised about a project's potential environmental effects.  *BARK v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020); *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005).  That is, a plaintiff need not show that significant effects will in fact occur, but only that substantial questions exist as to whether the project may cause significant degradation of some environmental factor.  *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008).

44.  In preparing an EIS, an agency must take a "hard look" at all reasonably foreseeable direct, indirect, and cumulative environmental effects of the proposed action.  In the Ninth Circuit, the "hard look" standard means that an agency's environmental analysis must be "more than perfunctory" and must rely on "accurate scientific analysis."  *Lands Council v. Powell*, 395 F.3d 1019

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

(9th Cir. 2005).

45.  If an agency determines that an EIS is not (or may not be) required, it prepares an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") describing why the action will not have a significant effect on the environment.  *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1101 (9th Cir. 2025).

46.  As with an EIS, an EA must take a "hard look" at all reasonably foreseeable environmental effects of the proposed action.  *350 Montana v. Haaland*, 50 F.4th 1254, 1264-65 (9th Cir. 2022).  The agency must also base its decision on a consideration of relevant factors and provide a convincing statement of reasons to explain why the proposed project's effects are not significant.  *Environmental Protection Information Center. v. U.S. Forest Service*, 451 F.3d 1005 (9th Cir. 2006).

47.   EAs must also "inform the public about [the] proposed action at the outset of the NEPA process."  *WildEarth Guardians v. U.S. Dep't of Agriculture Animal and Plant Health Inspection Service Wildlife Services*, 135 F.4th 717, 730 (9th Cir. 2025).  They may not "leave the public guessing where" the agency plans to conduct activities or "depriv[e] the public of the ability to evaluate the impacts of the agency's proposed actions."  *Id.*

48.  Agencies also may not segment large projects into separate environmental analyses:  A "single NEPA review document is required for distinct projects when there is a single proposal governing the projects or when the projects are connected, cumulative, or similar actions under the regulations implementing NEPA."  *Earth Island Institute v. U.S. Forest Service*, 351 F.3d 1291, 1304 (9th Cir. 2003) (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893-94 (9th Cir. 2002)).

49.  Under NEPA, cumulative effects result from the incremental impact of the proposed action when added to the impacts of other past, present, or reasonably foreseeable future actions.  "Reasonably foreseeable future actions" includes other reasonably foreseeable projects and any corresponding amendments to a Forest Plan prepared under NFMA.  *Native Ecosystems Council*, 304 F.3d at 895-900.

50.  The applicable Forest Service NEPA regulations set forth specific requirements for evaluating cumulative effects.  The Forest Service must first consider the "direct and indirect effects

-12-                    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

on the environment that are expected or likely to result from the alternative proposals for agency action" and then evaluate the present effects of past actions that are "relevant and useful because they have a significant cause-and-effect relationship with the direct and indirect effects of the proposal for agency action and its alternatives." 36 C.F.R. § 220.4(f) (2020). Once the Forest Service has identified the present effects of past actions that warrant consideration, the agency must assess the extent to which the proposed action's effects will add to, modify, or mitigate those past effects. *Id.*

51. In either an EA or EIS, NEPA requires an agency to consider a reasonable range of alternatives to serve the stated purpose and need for the proposed project, such that the agency may make an informed choice about whether and how to proceed. 42 U.S.C. § 4332(2)(C)(iii). An agency must "study, develop, and describe technically and economically feasible alternatives" and "appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(F), (2)(H). The existence of a feasible and appropriate but unexamined alternative renders an EIS or EA inadequate. *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013).

52. Before deciding on a proposal, the Forest Service must complete the environmental document review, consider public comments on environmental documents and agency responses to those comments, and consider the alternatives analyzed in the environmental documents. 36 C.F.R § 220.4(c) (2020).

53. The Forest Service must provide a public notice and comment period for a selected alternative where (1) the selected alternative was not within the range of alternatives the public could have reasonably anticipated the Forest Service to be considering, and (2) the public's comments on the draft environmental document do not apply to the selected alternative and do not meaningfully inform the Forest Service of the public's views with respect to the selected alternative. *State of Cal. v. Block*, 690 F.2d 753, 772 (9th Cir. 1982).

54. Moreover, the Forest Service is required to provide legal notice and an opportunity to comment when a "supplemental or revised EA or EIS is prepared [for a project or activity] based on consideration of new information or changed circumstances." 36 C.F.R. § 218.22.

//

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

**B. National Forest Management Act ("NFMA")**

55. NFMA governs the Forest Service's management of the National Forest System. 16 U.S.C. § 1600 *et seq.*

56. NFMA requires the Forest Service to develop "land and resource management plans" – or "forest plans" – for each unit of the National Forest System. *Id.* § 1604. Proposed projects and activities on a National Forest must be consistent with the adopted forest plan for that National Forest. 36 C.F.R. § 219.15(b), (d).

57. The Forest Service may amend an adopted forest plan to accommodate new information or changed circumstances. *Id.* § 219.13(a). Such forest plan amendments govern all future projects and activities on the relevant National Forest. In adopting forest plan amendments, the Forest Service must comply with NEPA and determine whether an EIS or an EA is required. *Id*. § 219.13(b)(3). A proposed forest plan amendment that may cause a significant environmental effect and thus requires preparation of an EIS "is considered a significant change in the plan for the purposes of the NFMA and therefore requires a 90-day comment period for the proposed plan and draft environmental impact statement." *Id.*

58. The NFMA regulations require the Forest Service to invite public comment on all forest plan amendments. *Id*. § 219.16. Where an EIS is required for a general forest plan amendment, the Forest Service must provide a public comment period of at least 90 days, except where the amendment applies to only to one project, in which case the Forest Service must provide a public comment period of at least 45 days. *Id.* § 219.16(a)(2). Where an EIS is not prepared for a forest plan amendment, the Forest Service must provide a public comment period of at least 30 days. *Id.*

59. Where there are site-specific or project-specific circumstances that necessitate amending a plan for a specific project or activity, the Forest Service may adopt an amendment that applies only to that project or activity ("project-specific amendment"). *Id.* § 219.13.

60. To make a project-specific amendment to a Forest Plan, the Forest Service "must articulate a rational connection between the facts found and the choices made to enact a geographically-limited, site-specific amendment rather than a general amendment to the Forest Plan as a whole." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, No.

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

3:12-CV-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014) (citing *Lands Council*, 529 F.3d at 1228).

61.  Except where (1) "no timely, specific written comments regarding the proposed project or activity . . . are received during any designated opportunity for public comment" or an "emergency situation exists," the Forest Service's "objection" process applies to "proposed actions of the Forest Service concerning projects and activities implementing land and resources management plans documented with a Record of Decision or Decision Notice."  36 C.F.R. §§ 218.4, 218.21, 218.1. That process constitutes the pre-decisional administrative review for such projects and activities. *Id.* § 218.1.

62.  An emergency situation is one where "immediate implementation of a decision is necessary to achieve one or more of the following: Relief from hazards threatening human health and safety; mitigation of threats to natural resources on NFS or adjacent lands; [or] avoiding a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration."  *Id.* § 218.21(b).

63.  The regulations require "issues raised in objections" to "be based on previously submitted specific written comments regarding the proposed project or activity and attributed to the objector, unless the issue is based on new information that arose after the opportunities for comment." *Id.* § 218.8(c).

**C.  Administrative Procedure Act ("APA")**

64.  The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, provides for judicial review of agency action.  Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in the record."  *Id.* § 706(2).  An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

U.S. 29, 43 (1983).

65. When reviewing agency action under the APA, a court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Id.* at 59. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

66. Under the APA, a reviewing court must also set aside agency action, findings, and conclusions found to be without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

## FACTUAL BACKGROUND

### A. The Plumas National Forest

67. Situated in the Sierra Nevada, the Plumas National Forest spans 1,146,000 acres and covers multiple California counties, including Plumas, Butte, Sierra, Lassen, and Yuba Counties. Known for its streams and lakes, deep canyons, and mountain valleys, the Plumas National Forest is also home to mature and old-growth trees, some of which are over 400 years old.[1] Only a small fraction of the world's mature and old-growth forests still stand today.

68. The Plumas National Forest is also home to numerous sensitive, threatened, and endangered species. One such species is the California spotted owl, which the Forest Service currently manages as a "sensitive species" due to the species' declining population and dwindling habitats. The California spotted owl relies on mature and old-growth forests for its nesting and roosting habitat, which are threatened by both logging and climate change.[2] In February 2023, the U.S. Fish and Wildlife Service proposed a rule to list the Sierra Nevada population of California spotted owls as threatened under the Endangered Species Act and specifically noted the adverse impacts to spotted owls that can result from mechanical thinning. 88 Fed. Reg. 11,600 (Feb. 23, 2023).

69. Because the California spotted owl is highly imperiled, the Plumas Forest Plan prohibits

---

[1] https://www.oldgrowthforest.net/ca-valley-creek.
[2] https://www.fs.usda.gov/research/treesearch/54985#:~:text=Spotted%20owls%20are%20habitat%20specialists,and%20large%20coarse%20woody%20debris.

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

logging in California spotted owl "Protected Activity Centers." These Protected Activity Centers "are designated protected areas where there are known or suspected nests of California spotted owl[s]." 2023 EA at Appendix 30. The purpose of these centers is "to protect and maintain high quality nesting and roosting habitat in the vicinity of nests." *Id.*

70. To circumvent the Forest Plan's restrictions and allow substantial logging in mature forest habitat used by California spotted owls, the Forest Service amended the Plumas Forest Plan via a set of "project-specific" amendments as part of its decision approving the Central/West Slope Project.

**B. The Community Protection Concept and Central/West Slope Project**

71. On May 4, 2022, the Forest Service publicly proposed a "Community Protection Concept" purportedly to reduce wildfire risk to communities across the Plumas National Forest, focused on four areas: (1) West Slope Communities, (2) Greater American Valley, (3) Greater Mohawk Valley, and (4) Eastside Communities. The public notice included a map marking all four affected areas. *See* Figure 1 (below). The Forest Service marketed the Community Protection Concept as single project to reduce the risk of wildfire impacts to communities and noted the purported need to amend the Plumas Forest Plan. The notice also stated that the Forest Service would undertake NEPA review for the Community Protection Concept. The Community Protection Concept has not been implemented as such, and a comprehensive NEPA review for that whole project has not been done.

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

**Figure 1:** Community Protection Concept Project Area (Notice of Proposed Action: Opportunity to Provide Scoping Comments: Community Protection (Protect) Project at 9, Fig. 2)



72.  Instead, in September 2022, the Forest Service divided the Community Protection Concept into two projects with separate NEPA reviews: (1) the Central/West Slope Project and (2) the Eastside Project.[3]  The Central/West Slope Project covers approximately 217,721 acres of federal land and includes the West Slope Communities, Greater American Valley, and the Greater Mohawk Valley.  The Eastside Project covers approximately 57,462 acres of federal land in the Eastside Communities.  Both the Central/West Slope Project and the Eastside Project were included in the original Community Protection Concept.  The Forest Service did not provide any reason for separating these related actions into two projects with separate NEPA analyses.

73.  Both the Central/West Slope Project and the Eastside Project would entail logging solely or largely in the Beckwourth Ranger District of the Plumas National Forest.  The projects are

---

[3] https://www.fs.usda.gov/sopa/components/reports/sopa-110511-2022-10.html.

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

geographically separated by less than 20 miles.

74. Both the Central/West Slope Project and the Eastside Project propose to use mechanical logging and prescribed burns in similar landscapes to serve the same purported purpose of reducing wildfire risk and severity, thereby enhancing community protection from wildfire events. Despite these similarities and the interrelated nature of the proposed actions, the Forest Service prepared separate EAs for them – again, without claiming that, or explaining why, it made sense to do so.

75. The Central/West Slope Project and the Eastside Project are not the only logging projects the Forest Service is proposing or recently has implemented in Plumas National Forest and adjacent forestlands. Additional surrounding projects also claim to mitigate risks to critical infrastructure and communities through logging.

## C. The Central/West Slope Project NEPA Process and Analysis

### 1. The 2023 Draft EA and Emergency Decision Notice (Decision 1)

76. In June 2023, the Forest Service released a Draft EA for the Central/West Slope Project and opened a 30-day comment period ("2023 Draft EA"). The stated purpose of this Project was to mitigate wildfire risk to communities and critical infrastructure through "fuels reduction and other vegetation treatment" on 217,721 acres throughout the Plumas National Forest.

77. The specific treatment that the 2023 Draft EA proposed to apply is "variable density thinning." In the EA, this term essentially operates as a euphemism for industrial logging. In particular, this treatment approach removes clumps of trees to prepare sizeable "gaps." 2023 Draft EA at 2-3 to 2-4. The 2023 Draft EA proposed creating gaps of up to 3 acres in size where trees up to 30 inches in diameter at breast height (dbh) could be felled and removed. 2023 Draft EA at 2-3.

78. To implement this variable density thinning approach, the Forest Service proposed a variety of methods for removing vegetation, including primarily mechanical thinning, prescribed fire, and herbicide application. Mechanical thinning refers to "the felling and removal of trees using heavy machinery," which employs bulldozers, harvesters, excavators, and skidders. 2023 Draft EA at 2-4. Mechanical thinning for this Project would involve mainly "whole-tree skidding," a technique where "the entire tree would be cut and removed." *Id.* Skidders, which are heavy vehicles used in the logging industry, would then drag the trees across the forest to a landing, where they would be

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

"processed and cut to market length." *Id.* To accommodate this heavy equipment, new roads would be constructed through the forest. *Id.*

79. Of the 217,721 acres included in the Project – under the most aggressive Alternative, which the Forest Service would later choose – the 2023 Draft EA proposed roughly 177,000 acres of mechanical thinning using heavy equipment and roughly 35,000 acres of manual thinning. 2023 Draft EA at Table 2-8. While prescribed burning would accompany both mechanical and manual thinning, only approximately 5,600 acres would be subject solely to prescribed burning, despite the lower cost of this vegetation management approach and despite the Forest Service's admission that "it is known that tree removal is not required before prescribed fire can be used." *Id.*; 2023 Consideration of Comments for Community Protection – Central and West Slope Project at 37.

80. The extent of the forest "thinning" planned as part of the Project exceeds the levels authorized by the Plumas Forest Plan. To protect important wildlife habitat, the Plumas Forest Plan specifies basal area and canopy cover requirements and imposes restrictions on the maximum size of trees that can be cut in mature forests outside the wildland urban interface. To accomplish the more intensive and extensive logging proposed in the Project, the Forest Service had to amend the Plumas Forest Plan in a way that disregards these protective measures and allows more habitat-destructive logging. Despite this significant change in applicable conservation requirements, the 2023 Draft EA barely discussed the applicable science and resulting impacts on wildlife species and their habitat.

81. Instead, the Forest Service justified its more intensive approach by pointing to two General Technical Reports prepared in 2009 and 2012, both drafted by Forest Service researcher Malcolm North. 2023 Draft EA at 1-3; 2023 EA at 1-4. Since the preparation of these reports more than a decade ago, there has been extensive real-world experience with wildfire on forests stands in and near the Plumas National Forest, as described below, and numerous new scientific studies have been published. The analysis in the 2023 Draft EA did not address these changes in any meaningful way, and the Forest Service did not change its decision to amend the Plumas Forest Plan in response to it.

82. During the 30-day public review period on the 2023 Draft EA, Plaintiffs submitted extensive comments concerning the Forest Service's failure to take a hard look at potential effects or

-20-                    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

analyze a reasonable range of alternatives, explaining that a full EIS should be prepared consistent with the requirements of NEPA.

83. In addition, Plaintiffs provided a detailed scientific analysis supported by reference and citation to dozens of studies raising substantial questions about the assumptions on which the Project analysis was based.

84. For instance, Plaintiffs explained that the Forest Service's underlying approach to reducing community wildfire risk – based on the assumption that mechanical thinning and post-fire logging of vast forest areas distant from communities will stop fires from reaching towns, or sufficiently slow fires to allow suppression before they reach communities – was employed, and proved to be a failure, on similar nearby forest lands during the Camp Fire of 2018 (which reached and burned the town of Paradise), the Dixie Fire of 2021 (which reached and burned the town of Greenville), the Caldor Fire of 2021 (which reached and burned the town of Grizzly Flats), and the North Complex Fire of 2020 (which reached and burned the towns of Berry Creek and Feather Falls). In support of these comments, Plaintiffs provided detailed maps and imagery showing how extensive logging on upwind private and public forest lands prior to each of these four wildfires did not protect human communities or achieve the risk reduction that the Forest Service asserts will occur through similar logging as part of the Project.

85. Plaintiffs further explained that the Ninth Circuit Court of Appeals recognized in *BARK v. U.S. Forest Service*, 958 F.3d 865, 870 (9th Cir. 2020), that the efficacy of "variable density thinning" – which the 2023 Draft EA prescribed for all areas within the Central/West Slope Project (*see* 2023 Draft EA at 2-3) – in reducing wildfire risk is the subject of "considerable contrary science and expert opinion" and that such a dispute raises "substantial questions" requiring preparation of an EIS that fully engages this issue.

86. Plaintiffs also cited numerous studies (1) demonstrating that mechanical thinning and post-fire logging in forests of the kind in the Central/West Slope Project area did not reduce wildfire severity and may actually increase it; (2) suggesting that mechanical thinning in mature and old-growth forests kills more trees than it saves from wildfire; (3) showing that mechanical thinning of dry forests emits more carbon dioxide to the atmosphere than even the most intensive wildfires; and

-21-                    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

(4) showing that mechanical thinning can increase the rate at which wildfires spread.

87.  In September 2023, following close of the public comment period on the 2023 Draft EA, the Forest Service issued a purportedly final EA ("2023 EA").  The 2023 EA was essentially unchanged from the Draft 2023 EA.  In the 2023 EA, the Forest Service summarily dismissed Plaintiffs' comments and supporting evidence and chose not to engage in a meaningful analysis of the science in an EIS, as the Ninth Circuit Court of Appeals required in *BARK*.  The Forest Service dismissed the large body of scientific evidence submitted by plaintiffs about how to best protect communities from wildfires by claiming that this evidence is beyond the scope of the Forest Service's consideration – in a Project that the agency claims is about community wildfire safety.  *See, e.g.,* 2023 Consideration of Comments for Community Protection – Central and West Slope Project at 48.

88.  For instance, the Draft 2023 EA had included, as part of its objective to "[r]educe the potential for extreme fire behavior in the wildland-urban interface," the goal of "slow[ing] fire spread."  2023 Draft EA at 1-3.  But rather than grappling with research submitted by Plaintiffs demonstrating that mechanical thinning can increase the rate at which wildfires spread (including research by the Forest Service's own scientists), and analyzing and disclosing the increased potential risk to homes and human lives that increased wildfire speed may cause, the Forest Service "edited" the Purpose and Need statement in the 2023 EA to "remove reference to the rate of wildfire spread." 2023 Consideration of Comments for Community Protection – Central and West Slope Project at 21.

89.  In their comments, Plaintiffs had also highlighted alternative ways to achieve the stated purpose of the Central/West Slope Project of reducing wildfire risks for human communities.  First, Plaintiffs proposed the alternative of defensible space pruning on National Forest lands adjacent to private properties combined with prescribed fire, without thinning on the rest of the Project area. Plaintiffs provided substantial evidence that the only effective way to protect homes from fire is home-hardening and defensible space pruning within a few hundred feet or less of homes.  Plaintiffs also cited scientific evidence that tree removal is not necessary prior to using prescribed fire as a community safety buffer from extreme fires.  Second, Plaintiffs requested that the Forest Service consider using hand thinning of small trees and under-burning as a reasonable alternative for achieving the Project's stated community protection purpose.

-22-                          Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

90.  Plaintiffs emphasized that, compared to the narrow alternatives proposed by the Forest Service, the reasonable alternatives discussed in the prior paragraph were cheaper, less environmentally destructive, and better addressed the stated purpose and need for the Project.

91.  The 2023 EA did not meaningfully address these comments or explain why such alternatives were unreasonable or infeasible for consideration.

92.  Plaintiffs also submitted comments on the adverse impacts of logging on California spotted owls, alerting the Forest Service that the U.S. Fish and Wildlife Service had recently proposed to list the California spotted owl in the Sierra Nevada as "threatened" under the Endangered Species Act.  Plaintiffs referenced studies, including studies conducted by Forest Service personnel, showing that mechanical thinning in California spotted owl habitat is associated with higher fire severity in many cases.

93.  The declining population status of the California spotted owl is a particular concern for the Project, which the 2023 EA estimated will log nearly 69,000 acres of California spotted owl Protected Activity Centers and Home Range Core Areas.  Given these facts, and the adverse impacts to California spotted owls from both mechanical thinning and post-fire logging discussed within the EA, the Forest Service had a heightened legal duty to fully evaluate Project impacts on this candidate species.

94.  But instead of adequately evaluating the Project's impacts on the California spotted owl, the Forest Service responded dismissively to public comments and concerns.  It did not engage the science showing that logging in this habitat can be detrimental to the species.  Instead, it stated, without support, that because the Project's proposed variable density thinning would protect the largest trees in clumps, it would promote a heterogenous forest structure that is "not expected to further degrade the level of existing viability" of the species.  2023 EA, Response to Comments at 6. Indeed, the Forest Service amended the Plumas Forest Plan as part of its Central/West Slope Project decision to allow *more* logging in California spotted owl protected habitat than currently permitted.

95.  The 2023 EA identified 12 other reasonably foreseeable logging projects on the Plumas and adjacent Tahoe National Forests, including the 58,000-acre Eastside Project and the 146,000-acre North Yuba Project.  These projects add more than 230,000 additional acres of forested area that will

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

be subject to similar "fuels treatment," including logging, in proximity to the Central/West Slope Project. 2023 EA at Table 3-1. The 2023 EA stated that the effectiveness of the Central/West Slope Project in fulfilling its stated objective of community protection from wildfire requires implementing these adjacent logging projects. 2023 EA at 3.1-1–24.

96. For each of the 12 reasonably foreseeable logging projects in the Plumas and Tahoe National Forests, the 2023 EA listed a description of its purpose, its approximate acreage, its planned start date, and which National Forest and Ranger District(s) they fell within. 2023 EA at 3-2 to 3-4. However, the 2023 EA did not provide any estimate of the total acres of forest lands affected by these projects, or any other quantitative assessment of how the Project, in combination with other nearby projects, would affect the California spotted owl (such as the total expected loss of suitable spotted owl habitat as a result of all of the projects combined or the potential population loss that could result from those combined projects) or the ecological integrity of the Plumas National Forest.

97. The 2023 EA omitted the adjacent North Fork Forest Recovery Project, another mechanical thinning project within the Plumas National Forest that also claims to protect communities from fire via logging in remote forests, from its list of nearby projects, even though the initial Proposed Action and Purpose and Need document for that project is dated September 2023 and was thus reasonably foreseeable at the time that the 2023 EA was issued.

98. In addition, the Forest Service chose to segment the environmental review for the Community Protection Concept into the closely related and interdependent logging activities included in the Central/West Slope Project and the Eastside Project.

99. On September 10, 2023, Plumas National Forest Supervisor Christopher Carlton signed and approved the Decision Notice for the Central/West Slope Project, which incorporated a Finding of No Significant Impact under NEPA ("Decision 1"). The Decision Notice partially implements the Central/West Slope Project and is the "first in a staged decision-making approach." The Decision Notice approved the logging and burning of 69,925 acres of the LaPorte Greater Mohawk Area, including 54,026 acres of mechanical thinning, 13,801 acres of manual thinning, and 69,925 acres of prescribed burns.

100. Decision 1 selected Alternative 1 from among the four alternatives in the 2023 EA. The

-24-    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

selected alternative prescribes the most intensive logging of all of the Alternatives throughout the Project area and would yield the least-dense forest stands of all four alternatives considered in the 2023 EA.  2023 EA at 2-9.

101.  Alternative 1 also encroaches on approximately 464 acres of inventoried roadless areas and 4,566 acres of designated wilderness, including approximately 20 percent of the Bucks Lake Wilderness.

102.  This encroachment would also require the Forest Service to amend the Plumas Forest Plan to permit the use of prescribed fire within Bucks Lake Wilderness.  2023 EA at 2-10.

103.  In connection with Decision 1, the Forest Service invoked an "emergency" authorization to suspend standard public participation processes.  The Forest Service justified the "emergency" authorization on the ground that the Project will "mitigate the harm to life, property, or important natural or cultural resources," without further explanation.  16 U.S.C. § 6592c(a).

104.  Decision 1 stated that Project implementation would begin "immediately after notifying interested and affected parties of this decision."

105.  On July 14, 2023, nearly two months before execution of the Decision Notice, the Forest Service solicited bids for the Central/West Slope Project.

106.  On September 11, 2023, one day after Decision 1 was signed, the Forest Service opened the bidding process to log the forest.

107.  On December 18, 2023, the Forest Service awarded a contract for approximately $86 million to Sierra Tahoe Environmental Management, LLC, to implement Project activities on 70,043 acres of the area encompassed by Decision 1.  Sierra Tahoe is a California company formed in August 2023, the month before the Decision Notice was issued, apparently in response to the bid solicitation.

108.  Decision 1 is currently in effect.

109.  On information and belief, the Forest Service issued a Notice to Proceed signed October 1, 2025 to Sierra Tahoe for three work items within the signed contract to implement the majority of Decision 1, including cutting and removing timber within a portion of the Decision 1 treatment area.

110.  On information and belief, the contractor began logging in the "Opportunity Treatment

-25-    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Area" delineated by the contract, which is located near the community of Greenhorn, on or before November 18, 2025.

111. On information and belief, the contractor's team has the capacity to log up to 10 acres of forest per day in the Opportunity Treatment Area when ground and weather conditions permit.

**2. The 2024 EA and Publication of Second Draft Decision Notice**

112. The Forest Service released a second draft decision notice in October 2024 that proposed various management actions, including extensive mechanical thinning and other logging, across tens of thousands of acres of forest ("Draft Decision 2"). The draft decision notice maintained the Project's focus on mechanical logging – including both mechanical thinning and post-fire logging – as it slated approximately 160,000 acres of forest for mechanical thinning that were not encompassed by Decision 1.

113. Although the 2023 EA covered the areas contemplated in both Decision 1 and Decision 2, the Forest Service prepared a different environmental assessment dated October 2024 ("2024 EA") and relied on that 2024 EA in proposing Draft Decision 2.

114. The 2024 EA covers the same geographic area as the 2023 EA and contains much of the same language. However, the 2024 EA is 67 pages longer than the 2023 EA.

115. The additional pages constitute substantive changes driven by two developments.

116. First, the Forest Service identified two errors in the 2023 EA's analysis pertaining to California spotted owl habitat. For one, the 2023 EA had double-counted over 3,000 acres of suitable habitat within the Project area, causing the Forest Service to underestimate the proportion of habitat that would be destroyed by logging operations associated with Alternative 1, which the Forest Service had selected as its alternative in Decision 1.

117. The Forest Service admitted in the 2024 EA that the 2023 EA contained these mathematical errors. Yet the Forest Service did not explain how Decision 1, which was based entirely on the 2023 EA, could stand given this error.

118. The Forest Service's second error involved misclassifying 5,040 acres of Wild, Recreational, Scenic, and Wilderness areas. The Forest Service incorrectly excluded "Eligible Wild River on Frazier Creek near the Graeagle, Eligible Recreational and Scenic Rivers near Mabie,

-26-                    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Portola, and Beckwourth, and a small section of Buck's Lake Wilderness Area." 2024 EA at 2-1. The 2024 EA noted that in the 2024 EA, "the interdisciplinary team corrected this misclassification and has made changes to the treatment intensity and method for these locations." *Id.*

119. Second, in June 2024, the Forest Service released a document entitled "Project-specific Plan Amendments for California Spotted Owl Habitat" ("Amendments Document").[4] This document set out "amendment components" for the Modoc, Lassen, Plumas, Tahoe, Eldorado, and Stanislaus National Forests to adopt as project-specific amendments to their governing Forest Plans, including the Plumas Forest Plan.

120. These amendment components fall into one of four categories: 1) Required; 2) Required with Choice; 3) Optional; and 4) Do Not Amend. According to the Amendments Document, any project that 1) proposes a project-specific amendment and 2) impacts California spotted owl habitat "must" also adopt, "at a minimum," the "Required" amendment components.

121. The Central/West Slope Project is such a project – that is, a project that proposed making project-specific amendments to the Plumas Forest Plan to enable the thinning of considerable California spotted owl habitat. Accordingly, the Project triggered the Amendments Document "requirements."

122. After it released the Amendments Document, the Forest Service used the 2024 EA to introduce a new option for the Project that featured many more of the Amendments Document's project-specific amendments. This new option, "Alternative 4" – which would replace Alternative 1 as the Forest Service's selected alternative for Decision 2 – lists 23 project-specific amendments. Eighteen of these amendments come verbatim from the Amendments Document.

123. The project-specific amendments that Alternative 4 adopted from the Amendments Document would allow for more intensive logging than those allowed by Alternative 1. Although Alternative 1 itself sought to override the Plumas Forest Plan's prohibition on mechanical logging in California spotted owl Protected Activity Centers ("PACs"), it still would have prohibited mechanical logging in PACs that owls currently occupy. 2025 EA C-16.

---

[4] https://www.fs.usda.gov/media/21423

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

124. Alternative 4 would remove this restriction.  Specifically, Alternative 4 would amend the Plumas Forest Plan to allow mechanical thinning everywhere except ten-acre zones around recently confirmed California spotted owl nesting sites.  2025 EA at C-21.  Because PACs (which are generally about 300 acres in size each) include both nesting and roosting sites, this amendment would substantially diminish the acreage of habitat protected from mechanical logging much further than the proposed amendments in Alternative 1.

125. Moreover, while Alternative 1 lists 34,850 acres as subject to manual thinning, Alternative 4, as described in the 2024 EA, would reduce that area to 25,464 acres.  2024 EA at 3.1-27.  (The final version of the EA, published in 2025, listed the total maximum acreage subject to manual thinning under Alternative 4 as 31,682 acres.  2025 EA at 2-38.)

126. Alternative 4 would loosen the Plumas Forest Plan's protections in other ways, including by authorizing the logging of live conifers larger than 30 inches in diameter in a broader range of circumstances than the Plumas Forest Plan would otherwise permit.  2025 EA at C-25.

127. Despite identifying and correcting significant data errors and adding a new alternative in the 2024 EA, which Draft Decision 2 selected, the Forest Service did not provide any opportunity for the public to comment on the 2024 EA.

128. Rather, the Forest Service limited objections to its Draft Decision 2 to those individuals "who submitted project-specific written comments during scoping or other designated comment period."  2024 EA 1-7.  As a result, only a small pool of commenters could comment on the 2024 EA and Alternative 4; the broader public was excluded.

129. Plaintiffs filed objections to Draft Decision 2.  Plaintiffs called upon the Forest Service to prepare an EIS because of the significant impacts of the Central/West Slope Project, now made even greater by the Forest Service's errors, additional Plumas Forest Plan amendments, and other changes in Alternative 4.  Plaintiffs also objected to the Forest Service's segmentation of the Central/West Slope Project from the Eastside Project, as well as from the North Fork Forest Recovery and Tributaries Projects, in its NEPA review.  Plaintiffs explained that, together, Decision 1, Draft Decision 2, the Eastside Project, and other adjacent large projects covered "nearly half a million acres" of logging, and "target[ed] the last, best mature and old-growth forest and complex early seral

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

forest habitat" of the Plumas National Forest.

130. Plaintiffs urged the Forest Service to fully examine the Central/West Slope Project's significant impacts. Their objections contained maps, photos, and other evidence to demonstrate the public safety risk of mechanically thinned forests. Plaintiffs submitted additional information on the spotted owl's imperiled status and the Project's impact on the owl's habitat. And Plaintiffs raised concerns about how mechanical thinning leads to increased overall tree mortality.

131. In their objections, Plaintiffs also reiterated their concern that the Forest Service had failed to analyze a reasonable range of alternatives. In particular, Plaintiffs supported their request that the Forest Service study an alternative that would use solely prescribed fire and hand thinning to create defensible space near structures with dozens of recent and peer-reviewed studies. These studies, many of which were authored by Forest Service and National Park Service scientists and land managers, demonstrate that fire alone could be applied in conifer forests in the Western United States, as within the Project area, without prior tree removal. They also show that mechanical thinning increases overall tree mortality and increases wildfire speed because reducing the number of trees in the forest lowers resistance to winds that drive the flames. The approach advocated by Plaintiffs, the studies show, would also avoid the severe and damaging effects of logging to both public safety and California spotted owls from the variable-density thinning approach the Forest Service selected in Draft Decision 2.

132. On March 31, 2025, the Forest Service published a document entitled "Objection Review Summary," in which the agency responded to Plaintiffs' and other objections.

133. The Objection Review Summary dismissed the studies that Plaintiffs submitted with their objections as "non-credible." Objection Review Summary at 2. The Forest Service dismissed Plaintiffs' objections even though: (1) Forest Service scientists and affiliates had authored many of the studies Plaintiffs submitted; (2) many of those studies had been authored by scholars at universities and published in peer-reviewed journals; and (3) many of those studies seriously undermined the Forest Service's conclusion that mechanical thinning would achieve the Central/West Slope Project's stated goal of community protection from wildfire. The studies also supported Plaintiffs' arguments that the Project had substantial adverse ramifications for public safety and that

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

the cumulative effects of the Project and similar nearby projects would significantly, adversely affect sensitive species and ecosystem functions.

134. Three days later, on April 3, 2025, Deputy Regional Forester Christopher Feutrier provided a final written objection response to those who had filed objections, with the Objection Review Summary appended.

135. The response explained that Mr. Feutrier had concluded the pre-decisional review process. The response also explained that Mr. Feutrier had directed Forest Service staff to make several changes to the documentation supporting the Project, including to "[u]pdate the Comment Consideration documentation to include Alternative 4 where applicable"; explain several aspects of the methodology used to estimate California spotted owl habitat; review and update the cumulative effects assessment with additional projects (including the Tributaries and North Fork Forest Recovery projects); and limit mechanical thinning within Scenic Zones.

136. Other than these changes, the response did not make any alterations to either the 2024 EA or Draft Decision 2.

137. On July 1, 2025, the Forest Service released a final, signed second Decision Notice ("Decision 2") that selected Alternative 4. Decision 2 approved mechanical thinning on up to 122,980 acres of forest as well as 25,801 acres of post-fire logging. In total, the two Decisions direct mechanical thinning on up to 177,006 acres of forest and total logging (including post-fire logging) on over 200,000 acres, or approximately 17 percent of the Plumas National Forest.

138. The Forest Service concurrently published an EA ("2025 EA") that incorporated Mr. Feutrier's directives described in paragraph 135 but did not make any other changes.

139. No EA for the Project has specified which precise acres within the Project area would be subject to which logging or other management method(s). The most specific indication of what management will occur where is in (1) a table describing "maximum acreage" of each management approach within the Project area; and (2) a list of "allowed" activities in large "planning units," which range from hundreds to tens of thousands of acres in size. 2025 EA at 2-31, Table 2-8; 2025 EA at 2-38, Table 2-10.

140. Rather, the 2025 EA stated that the approximately 200,000 acres subject to "Mechanical,

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Manual, and Prescribed Fire Methods" "could be subject to a combination of treatment methods, including mechanical thinning, mastication, grapple piling, manual thinning, pile burning, and/or prescribed fire."  2025 EA at 2-31, Table 2-8.

141.  Decision 2 is currently in effect and specifies that the Forest Service plans to implement it "beginning in 2025."

**D.  Neighboring Projects**

142.  The Central/West Slope Project – and the nearby Eastside Project, which together constituted the original Community Protection Concept – are just two of several large logging projects that the Forest Service is proposing, implementing, or has recently implemented in the Plumas National Forest and adjacent forests.

143.  These additional neighboring projects also claim to mitigate risks to critical infrastructure and communities through logging, including variable-density thinning, post-fire logging, and other intensive management.

144.  One such project is the North Fork Forest Recovery Project.  On June 23, 2025, the Forest Service finalized a decision notice for that project.  The decision notice authorizes logging and other "treatments" in an additional 166,889 acres of the Plumas National Forest, directly north of the Central/West Slope Project area.  2025 EA at Table 3-1.  Together, the Central/West Slope Project, the Eastside Project, and the North Fork Forest Recovery Project allows thinning of approximately 276,800 acres of forest – approximately a quarter of the Plumas National Forest.

145.  Like the Central/West Slope Project and Eastside Project, the North Fork Forest Recovery Project proposes a mix of variable-density thinning, "fuels reduction," and herbicide spraying, also purportedly to reduce wildfire risk to surrounding communities.  North Fork Forest Recovery Project Decision Notice at 3.

146.  As with the Central/West Slope project, the Forest Service did not complete an EIS for the North Fork Forest Recovery Project, instead choosing to rely on an EA and a Finding of No Significant Impact.

147.  The Tributaries Forest Recovery Project is yet another proposed logging project directly adjacent to the Central-West Slope Project within the Plumas National Forest.

-31-    Case No. 2:24-CV-00909-TLN-JDP

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

148. In December 2025, the Forest Service released a final decision notice for the Tributaries Forest Recovery Project that approved up to 14,983 acres of commercial mechanical thinning and 4,936 acres of other mechanical logging of the Plumas National Forest, in addition to the area that may be thinned within the Central/West Slope Project. The Forest Service once again declined to prepare an EIS for this project. Added to the Central/West Slope Project, the Eastside Project, and the North Fork Forest Recovery Project, the Tributaries Forest Recovery Project would bring the total acres subject to intensive logging operations to nearly 300,000 acres of forest.

149. Another related project is the North Yuba Landscape Resilience Project, a project covering 275,000 acres within the adjacent Tahoe National Forest. The North Yuba Landscape Resilience Project contemplates another 40,641 acres of thinning.

150. Like the Central/West Slope Project and several of the other logging projects listed in the Project EA, the North Fork Forest Recovery Project and the Tributaries Forest Recovery Project propose making project-specific amendments to the Plumas Forest Plan. Those amendments would authorize more intensive activities than what the governing Forest Plan allows, potentially producing cumulative, ecosystem-wide changes in forest composition.

151. The 2023 EA, 2024 EA, and 2025 EA provide the total acreage and brief descriptions of the Eastside Project, the Tributaries Forest Recovery Project, the North Fork Forest Recovery Project, and the North Yuba Landscape Resilience Project individually. But no EA for the Project provides any estimates of the total amount of manual or mechanical thinning or post-fire logging planned within the Plumas National Forest or any other estimates of how many acres of forest or acres of suitable California spotted owl habitat may be affected, disturbed, or eliminated by the different Forest Service project activities in the area. Similarly, none of these documents include any evaluation of how these proposed projects will, collectively and cumulatively, affect or alter the ecological integrity of the forestlands on which they occur or affect the populations of the species occupying those forestlands, such as the California spotted owl.

152. In particular, the EAs and Decision Notices also do not calculate the total acreage of sensitive species habitat that the Forest Service projects in the Plumas and Tahoe National Forests would disrupt. Rather, the 2025 EA simply concludes that "[c]ontributions to cumulative adverse

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

impacts . . . would be minimal" due to the implementation of "design features."  2025 EA 3.2-71.

**E.    The NFMA Forest Plan Amendment Process**

153.  All of the Project EAs claim that the project-specific amendments contemplated by Alternatives 1 and 4, respectively, "would apply only to the Project area."  2023 EA at 2-15; 2024 EA at 2-19; 2025 EA at 2-19.  Yet the Amendments Document directs that every qualifying project's "project-specific" amendments must mirror those adopted in every other qualifying project across six National Forests.

154.  Nothing in the 2025 EA's project-specific amendments to the Plumas Forest Plan describe or document unique characteristics of the Central/West Slope Project site.  Instead, the project-specific amendments incorporate generic language from the Amendments Document:  The 2025 EA adopts fifteen of these amendments verbatim.

155.  The project-specific amendment components in the Central/West Slope Project EAs have been incorporated into other logging projects proposed for the Plumas National Forest.  The North Fork Forest Recovery Project EA contains seventeen project-specific amendments copied verbatim from the Amendments Document, including twelve that are identical to amendments in the 2025 EA for the Central/West Slope Project. The final EA for the Tributaries Forest Recovery Project similarly adopts sixteen of the project-specific amendments contained in the Amendments Document, nine of which are identical to amendments in the 2025 EA for the Central/West Slope Project.

156.  As in the Central/West Slope Project EAs, neither the North Fork Forest Recovery Project EA nor the Tributaries Forest Recovery Project EA adjust the boilerplate text in the Amendments Document to reflect unique features of their respective sites.

157. No EA or Decision Notice associated with the Central/West Slope Project explains on what factual basis the Forest Service chose to adopt site-specific amendments to the Plumas Forest Plan rather than a generally-applicable, forest-wide amendment to the Plumas Forest Plan, subject to additional public comment and participation regulations.

158. The Forest Service did not provide any comment period following the adoption of Decision 2.  Because it improperly framed its changes as project-specific changes, the Forest Service also failed to evaluate the amendment to determine whether the changes constituted a "significant

change" to the Forest Plan that would require a 90-day comment period and preparation of an EIS, as required by 36 C.F.R. 219.13(b)(3).

## CLAIMS FOR RELIEF

### First Cause of Action
### (Violations of NEPA)

159. Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above.

160. In approving the Project, the Forest Service violated, and is continuing to violate, NEPA by:

 a. Failing to prepare an EIS despite substantial scientific questions and expert dispute over the efficacy of mechanical thinning to achieve the Project's stated purpose of wildfire risk reduction for communities and infrastructure;

 b. Failing to take the requisite "hard look" and prepare an EIS despite the Project's potentially significant direct and cumulative impacts on mature and old-growth forests, the California spotted owl and other wildlife species, and community safety, and by producing an overly vague EA that failed to meaningfully disclose what management activities would actually occur where in the various Project units;

 c. Failing to ensure the scientific integrity of the discussion and analysis in its 2023 and 2025 EAs and failing to make use of reliable data and resources in fulfilling its NEPA obligations;

 d. Failing to consider and adequately evaluate the cumulative impacts of the Central/West Slope Project in conjunction with other nearby logging/thinning projects in adjacent forest habitat of the same type, including but not limited to the related Eastside Project, the adjacent North Fork Forest Recovery Project, and the Tributaries Forest Recovery Project;

 e. Failing to consider and adequately evaluate the cumulative impacts of the project-specific Plumas Forest Plan amendments that have been adopted or that foreseeably may be adopted through the Central/West Slope Project and other logging/thinning

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

projects, including but not limited to the North Fork Forest Recovery and Tributaries Forest Recovery Projects;

f.  Impermissibly segmenting environmental review for the Community Protection Concept into two separate NEPA analyses, thereby unlawfully piecemealing the evaluation of project impacts and avoiding the disclosure of collectively significant impacts and the Forest Service's obligation to prepare an EIS;

g.  Failing to consider and evaluate a reasonable range of alternatives to the proposed Central/West Slope Project, including but not limited to an alternative that includes no or much less mechanical thinning, an alternative that focuses thinning directly in the defensible space area at the wildland urban interface in combination with a buffer of prescribed fire around communities, and/or an alternative that allows only hand thinning of small trees and prescribed fire in the Project area;

h.  Failing to produce an EA that adequately informed the public about the proposed action at the outset of the NEPA process; and

i.  Failing to provide adequate opportunities for public comment on the 2024 EA, as required by 36 C.F.R. § 218.22(d).

161. For the foregoing reasons, the Forest Service's actions are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law and are subject to judicial review under the APA, 5 U.S.C. § 706(2).

## Second Cause of Action
### (Violations of NFMA)

162. Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth above.

163. In adopting the project-specific amendments to the Plumas Forest Plan in each of its two Decision Notices, the Forest Service violated, and is continuing to violate, NFMA and its regulations implementing NFMA by:

a.  Adopting project-specific amendments rather than a general Forest Plan amendment to allow additional thinning in California spotted owl habitat and thinning of larger trees

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

outside of that habitat;

b. Failing to articulate a rational connection between the facts before it – including facts pertaining to the effects of mechanical thinning and wildfire on the California spotted owl throughout the Plumas National Forest – and its choice to adopt project-specific amendments rather than general amendments to the Forest Plan;

c. Failing to evaluate whether the required general Forest Plan amendment would create potential significant environmental effects requiring the preparation of an EIS as required by 36 C.F.R. § 219.13(b)(3);

d. Failing to provide the public with the comment period mandated by 36 C.F.R. § 219(a) for forest plan amendments.

164.  For the foregoing reasons, the Forest Service's actions are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law and are subject to judicial review under the APA, 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Declare that Defendants' Environmental Assessments and Findings of No Significant Impact violate NEPA, USDA's NEPA regulations, and the Forest Service's NEPA regulations;

(2) Declare that Defendant violated NEPA by failing to prepare an Environmental Impact Statement for the Project;

(3) Declare that Defendant violated NEPA by failing to take a hard look at the Project and its effects;

(4) Declare that Defendant violated NEPA by failing to ensure the scientific integrity of analysis, and by failing to use reliable data;

(5) Declare that Defendant violated NFMA by adopting a project-specific Forest Plan amendment rather than adopting an amendment that applied generally to projects within the Plumas National Forest;

(6) Order Defendant to vacate and set aside all Environmental Assessments, Findings of No Significant Impact, Decision Notices, and any permits and contracts to third parties that involve the

-36-

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Central/West Slope Project and any other approvals or entitlements conditioned upon or arising out of those documents and approvals;

(7) Enjoin, preliminarily and/or permanently, Defendant from approving or allowing any third party to enter and perform any mechanical or manual thinning within the Central/West Slope Project area, unless and until Defendant complies with NEPA, NFMA, and their implementing regulations consistent with the Court's decision(s);

(8) Award Plaintiffs their reasonable attorneys' fees, costs, expenses, and disbursements associated with this action; and

(9) Grant Plaintiffs such additional relief as the Court may deem just and proper.

DATED:  February 27, 2026                    ENVIRONMENTAL LAW CLINIC
                                             Mills Legal Clinic at Stanford Law School

                                  By:    /s/ Amanda Zerbe
                                         Amanda Zerbe

                                         *Attorneys for Plaintiff JOHN MUIR PROJECT, PLUMAS FOREST PROJECT, and FEATHER RIVER ACTION!*

FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF